Filed 4/23/24

# <u>CERTIFIED FOR PARTIAL PUBLICATION</u>*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| HAYLEY MARIE NORMAN,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TRACEE ELLIS ROSS et al.,<br><br>    Defendants and Appellants. | B316971 consolidated with B326626<br><br>(Los Angeles County Super. Ct. No. 20STCV35711) |
| HAYLEY MARIE NORMAN,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>TRACEE ELLIS ROSS et al.,<br><br>    Defendants and Respondents. | |

---

*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of part D of the Discussion.

APPEAL from judgments and an order of the Superior Court of Los Angeles County, Laura A. Seigle, Judge. The judgments are affirmed; the order is reversed and the matter is remanded with instructions.

Plonsker Law Group, Michael J. Plonsker and Rex D. Glensy for Plaintiff and Appellant and for Plaintiff and Respondent.

Mitchell Silberberg & Knupp, Elaine K. Kim, Yakub Hazzard for Defendants and Appellants and for Defendants and Respondents.

---

## INTRODUCTION

Plaintiff Hayley Marie Norman filed a complaint alleging that her idea for a television series was stolen by defendants Tracee Ellis Ross, Artists First, Kenya Barris, Brian Dobbins, Touchstone Productions dba ABC Studios (ABC), and Big Breakfast LLC. Norman alleged her idea for a series—which she intended to star in, write for, and produce—was turned into a sitcom by defendants without her permission or involvement. Defendants contend the sitcom, a spinoff of an existing television series, was not based on Norman's ideas.

Norman filed a complaint alleging breach of implied-in-fact contract, breach of confidence, promissory estoppel, and other claims. The defendants filed special motions to strike under Code of Civil Procedure, section 425.16, the anti-SLAPP statute.[1] The

---

[1] All further undesignated statutory references are to the Code of Civil Procedure. "SLAPP" stands for "strategic lawsuits against public participation." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 139.) Big Breakfast did not file an anti-SLAPP motion, and is not a party to this appeal.

trial court granted the motions in full as to Barris, Dobbins, and ABC; the court denied the motions in part as to Ross and Artists First. The parties cross-appealed the court's order.

Upon de novo review, we find that all of Norman's claims arise from protected activity, and the trial court erred in holding that parts of Norman's claims against Ross and Artists First did not. We further find that Norman failed to demonstrate a probability of success on her causes of action. Thus, we find that the special motions to strike should have been granted in full. As such, we reverse and remand the court's order as it pertains to Ross and Artists First.

Defendants moved for attorney fees following the special motion to strike, and the trial court granted the motion in part, awarding defendants less than 30 percent of the fees they requested. Norman separately appealed after judgments were entered in favor of Barris, Dobbins, and ABC. She contends the trial court erred in not reducing the fee award even further. We deny defendants' motion to dismiss this appeal, find that the award was not an abuse of discretion, and therefore affirm the judgments entered in favor of Barris, Dobbins, and ABC.

## BACKGROUND

### A. Factual background

This case is at the pleadings stage, and therefore the facts are not fully developed. The parties did, however, present a significant amount of evidence in support of the anti-SLAPP motions and oppositions. For purposes of this appeal, the following facts are largely undisputed.

#### 1. Black-ish *and the character of Bow*

Defendant Kenya Barris created the television show *Black-ish,* which first aired in 2014. It is a 30-minute sitcom that

3

portrays a family headed by father Andre (Dre) and mother Rainbow (Bow) Johnson.  Bow, played by defendant Tracee Ellis Ross, is biracial, and the show includes themes relating to Bow's experiences as a mixed-race woman. Barris stated in a declaration that the character of Bow "was inspired by my wife, Dr. Rania 'Rainbow' Barris, who is biracial with a black mother and a white father."  Barris also stated that the character Bow's "mother Alicia is black and her father Paul is white, and they were hippies who raised Bow, and her younger siblings Johan and Santamonica, in a commune or 'cult' before it got raided by the government.  As a result, Bow does not share the same cultural background and experiences as her husband Dre, who grew up in an urban black neighborhood and has two black parents. Dre and his parents Pops and Ruby do not view Bow as 'really' black, while white people see Bow as a black woman."

The character of Bow was introduced in the pilot episode of *Black-ish*, which aired in September 2014.  In the opening moments, Dre, in a voiceover, introduced himself and Bow, describing her as a doctor and a "pigment-challenged mixed-race woman."  In the second episode, Dre commented that Bow "grew up in a house full of naked hippies."

Bow's parents, Paul and Alicia, were introduced in season 1, episode 16, titled "Parental Guidance," which aired in March 2015. The parents were portrayed as hippies, driving an RV that "runs on vegetable oil and animal waste," encouraging Dre to warm his "heart with the light from within," and talking about their past participation in civil rights marches.  Several episodes of *Black-ish* portray the culture clash between Bow's hippie parents and Dre's black family, and/or the white side of Bow's family and Dre's black family.  Bow's brother Johan became a

regular character in season 3 of *Black-ish*, and their sister Santamonica appeared in one episode in season 3.

 2. *"Being Bow-racial"*

 Bow's experiences with her racial identity were directly addressed in *Black-ish* season 3 episode 8, "Being Bow-racial," which aired in November 2016. In that episode, Bow and Dre's son, Junior, came home with his new girlfriend Megan, who was white. Bow had a strong reaction to seeing Junior with a white girlfriend. In a voiceover, Bow explained the history of mixed-race children in America, including the children of slaves and white owners. She stated that *Loving v. Virginia* (1967) 388 U.S. 1 (*Loving*) officially held that states could no longer prohibit interracial marriage, which resulted in skyrocketing rates of biracial births and "more people with an identity crisis who don't even know what to call themselves, and are always asking, 'Where do I fit in?'"

 The episode shifted back to the present, and Dre's mother suggested to Bow that she can't like Junior's girlfriend "if you don't even like yourself. And you don't even know who you are." Later, Bow's brother, Johan, suggested to Bow that she always had "an identity issue." The episode flashed back to Bow as a child, played by a child actor. Bow was in school, holding a pencil and looking at a registration form trying to figure out which "race" box to check. Young Bow asked the black teacher walking by, "How come there's not a box for both?" The teacher responded, "Baby, you'd better check black."

 Returning to the present, Bow said to Johan, "It was confusing! Didn't you ever struggle with which box to check? I mean if you check one, you're denying a whole part of yourself." In a later scene Bow told Johan, "I've been confused most of my

life. Do you remember me in high school?" The scene flashed back to teenage Bow played by Ross, looking and talking like a character from the film Clueless (Paramount Pictures 1995), walking down a school hallway with several white peers. In the present, Bow told Johan, "I couldn't help it though! I mean, that's who we grew up around.  Those were my friends." Johan asked skeptically, "Were they?"  The scene cut back to the high school flashback, where a white friend told teenage Bow, "You should like, totally audition for the theater this year.  We could really use some strong black actors."  Bow looked uncomfortable at the mention of her race, but agreed. The flashback then cut to a school production of The Wizard of Oz, with Bow playing the part of a flying monkey being rolled across the stage on a cart.

Back in the present, Johan asked Bow why she agreed to play a flying monkey.  Bow replied, "Admittedly, mistakes were made. But if you were in that situation you just—you over-compensate.  You do what you can to fit in."  Bow continued, "In college, with my black friends, I went in hella hard."  Again the scene flashed back, this time to Bow in college.  She was wearing sunglasses, large hoop earrings, and a shirt that revealed her midriff.  Bow approached a picnic table where several black friends were seated and called out, "What up y'all? Oh!" while gesturing with her arms. Bow then awkwardly danced and launched into a rap of her name.

Returning to the present, Johan told Bow it was no big deal that she "leaned into a few dumb stereotypes to try to get people's approval.  Everybody does it." Bow responded, "Yeah, but not everybody is pulled into day-to-day situations where they're forced to pick a side."  The scene flashed back again, this time to Bow sitting in the middle of a couch.  A group of black young

adults was sitting and standing to one side of her, and a group of white young adults was on the other side.  They were watching a television on which the O.J. Simpson verdict was about to be read.  When the not guilty verdict was announced, Bow initially turned to the black side of the room and joined their cheers.  However, she quickly turned to the white side of the room, saw their looks of shock and disappointment, and changed her expression.  Back in the present, Bow said to Johan, "I'm so confused."

Bow decided to talk with her white father, Paul, at his RV.  Bow told him she felt uncomfortable about Junior having a white girlfriend, and they discussed her confusion about her racial identity. Bow noted that Paul was white, and said she did not want to deny that half of herself. Paul suggested that because Bow had a black husband and a "black family," Junior choosing a white girlfriend "feels like a rejection."  Bow responded, "Exactly.  That's exactly it."  Paul reassured Bow, "you know who you are."  Bow nodded and responded, "I know who I am.  Thank you." As the scene ended with Paul and Bow hugging, Bow said in a voiceover, "So there it was—I had to go back to my past to look at my future."

3.    *Norman's development of* Tragic

Norman stated in a declaration that she began to develop a comedy television series in 2014 or 2015 "based on my own experiences growing up as a mixed-race woman in the suburbs."  Initially calling the series *Mixed*, she developed a treatment that she filed with the Writers Guild of America in 2016.  Norman's series idea was later called *Tragic* and *The Girl With the Hair*.  For ease of reference, we will refer to Norman's proposed series as *Tragic*.

In August 2017, Norman approached defendant production company Big Breakfast about selling or producing *Tragic*. Norman worked with producer Jillian Vogel, sending Vogel information about *Tragic*.[2]  In some of the early pitches Norman developed for the series, she described the show as "Arrested Development meets Black*ish*," and an "earnest, yet un-PC comedy about a biracial woman's fight to find acceptance in both her very White home and very Black workspace."  The show was supposed to be a fictionalized version of Norman's own life, with Norman as the star.

Norman asserts that she sent these materials to Vogel and Big Breakfast "with the understanding that pursuant to the custom and practice of the entertainment industry, they would be kept confidential and not used without payment to me."  Norman proposed *Tragic* as a series that she would write for, star in, produce, and "be compensated for all with appropriate credits."

Norman and Vogel continued collaborating to develop ideas for *Tragic*.  It was suggested that a "mixed-race celebrity" could get involved as a producer, and Norman thought Ross would be a good fit.  Vogel told Norman that Big Breakfast's parent company, Electus, was a "majority stake holder" in defendant management company Artists First, and the companies sometimes worked together.  Vogel told Norman that once the *Tragic* "deck" was done, "I'll be sharing with our managers at [Artists First] – they know of EP [executive producer] level talent who may be interested in attaching" to the project.

---

[2]      The series idea went through several iterations; the early versions that were never shared with defendants are not described in detail here.

In October 2017, Vogel sent the deck for *Tragic* to defendant Brian Dobbins, who was Ross's manager through Artists First; Dobbins forwarded the materials to Ross. The *Tragic* deck Dobbins received described the series as "an honest and irreverent look at 'post-racial America' told by Hayley Marie Norman, a biracial comedian who unabashedly confronts her identity in everyday interactions." The character Hayley "grew up not even knowing she *was* black. Living in the mayonnaise-white suburb of Agoura Hills will do that to a girl. Although she's forced to visit her parents back home in Agoura Hills often, Hayley now lives with her fiancé Sam in the newly labeled East Hollywood, a.k.a Little Armenia."

As for the "tone" of the show, the deck described *Tragic* as "an off-kilter comedy series that presents an unflinching, self-deprecating depiction of the minutiae of Hayley's everyday life as a biracial woman, and the predicaments she gets herself into with her friends, family, and complete strangers." Hayley was to be a millennial "who lives in the grey area of 'Feeling extremely self-confident,' and 'Waking up at 4AM to delete all the stupid shit you said on Instagram when you were feeling yourself.'" The deck described other characters including Hayley's white mother, black father, white half-sister, aunts, fiancé, and best friend. The deck included a meme-style picture, presumably of Norman as a child, with messy hair escaping an off-center ponytail. The picture included the words, "when ur mom is white and does ur hair for class picture day."

The deck stated that each episode of *Tragic* would start with a flashback to the life of "Young Hayley": "Every episode begins with a flashback into Hayley's uniquely diverse and comically misguided coming of age (i.e.[, t]he time her elementary

9

school teacher wouldn't let her choose both black and white on a standardized test . . . )." In one plot idea, a neighbor watches Young Hayley as she enters another neighbor's house to water the plants. In the present day, Hayley is shopping for wedding dresses and accuses a salesperson of following her because she's black; a video about the incident goes viral. Another episode's plot involves Christmas; in flashbacks, Young Hayley's white family takes her to see a white Santa Claus and her black family takes her to see a black Santa Claus. In the present day, Hayley's family gets upset when Hayley says she is not a Christian. In a third episode, Young Hayley runs for fifth grade class president, but another student tells her black girls can't be president. In the present day, "Hayley lectures all of her white friends on the importance of boycotting the Oscars for being #SoWhite, but then gets *totallyyyy* FOMO when none of them invite her to their viewing parties." In a fourth episode, Young Hayley gets detention for talking even though she is not the culprit. In the present day, Hayley is arrested for trying to take down a Confederate statue, and Hayley's sister "starts an Etsy business with 'Free Hayley' t-shirts." The "season arc" includes an engagement party with Hayley's and Sam's families; "Hayley's too outspoken, the families clash, a fight erupts, and Hayley and Sam are forced to take opposite sides. . . . [Hayley will] impulsively call off the wedding."

In November 2017, Norman and Big Breakfast entered into an agreement, the "Term Sheet," to develop *Tragic* and sell it to a broadcaster, network, distributor, or other financier. Ross then got involved to help develop the project. Norman and Ross first met in January 2018 to discuss ideas about *Tragic*; throughout 2018, Norman had conversations with Ross, Dobbins, and Vogel

10

about developing *Tragic*. In March 2018, Ross and Big Breakfast entered into a written agreement stating that Ross would assist with the development of *Tragic*, and in return would be attached to the series as an executive producer if it was set up with a financier.

In November 2018, a revised version of *Tragic* (now titled *The Girl With the Hair*) was prepared to pitch to financiers.[3] In the revised version of the deck, Norman introduced herself/her character: "I'm Hayley Marie Norman, The Girl With The Hair," and described herself as "a biracial woman in a not-so-post-racial America, torn between two very different identities, but ever hopeful that I'll eventually discover common ground with my family, friends and, more often than you'd expect, complete strangers!" The deck stated that Hayley was raised by her single, white mother "in a conservative, homogenous Los Angeles suburb," "Nobody in Agoura Hills, or even my own house for that matter, looked like me," and "I didn't even know I was black!" The show was to focus on "Hayley's personal exploration of 'belonging' [which] will, naturally, bring up racially charged social interactions that are ripe for commentary." The show would be "driven by Hayley's comically honest, and immensely personal, experiences. [¶] The series is Curb Your Enthusiasm . . . if Larry David was lovable. And half-black. And larger than life."

Hayley's white mother was to be a "neurotic[ ] catastrophizer" who lives with a long-term boyfriend. Hayley's black father was to be an unreliable "sweetheart" who loves gambling. Hayley's fiancé, Sam, was to be a musician and former

---

[3] Multiple versions of a deck are included with Norman's declaration, but it is unclear which one was the final version.

addict who is "very white." The deck asked, "[C]an Hayley really claim that she's pro-black when her own fiancé is white? Even her pussy is colonized!" One episode proposal suggested that Sam, a former heroin addict, was curious about trying ayahuasca; Hayley tries it and has a bad trip. Hayley's half-sister, who in the revised version of the deck is a black character named Jazmyn, "has a quick wit and is Black Twitter famous"; she's "eager to date but can't seem to find a black man she doesn't think is a 'fucknigga.'" Ross was to play a fairy godmother and mentor who "materializes, Cheshire Cat style—hair first, then the rest of her fills out."

Again the deck stated that each episode would begin with a flashback to Hayley's "comically misguided coming of age," such as "the time her elementary school teacher wouldn't let her choose both the black and white race boxes on a standardized exam." One episode idea was described in detail. The episode would begin with a flashback in which Hayley's white friends were shoplifting at a drug store, but Hayley was detained for it. In the present day, Hayley uses a lipstick at a store that is not a tester, and when a sales associate confronts her, Hayley says she didn't do it and "go[es] on an epic rant . . . about the epidemic and dangers of not believing black women." Hayley then lies about having a medical condition in an audition in an attempt to land the part of a "real patient" in a commercial. Another episode includes the class president/Oscars idea described above, but with Hayley's black half-sister Jazmyn stepping in to show Hayley "all the best classic black films that Hayley missed out on in her childhood (and which she's spent her whole life pretending to have seen . . . )." A third episode idea includes Hayley being

"forced to spend Thanksgiving with Sam's Trump supporting Evangelical family in the corn fields of Illinois."

A written discussion portion of the pitch included a conversation-style narrative about the show, including jokes, among Ross, Norman, and others.  In it, Norman stated that when she discussed the show idea with Ross, Ross "told me that she too has struggled with the same identity issues I struggle with and that every person who doesn't fit neatly into some preconceived box struggles with. . . . And she too has dealt with feelings of rejection, and insecurity, and being around black people and having to secretly look around to make sure they didn't catch her accidentally clapping off beat."  Ross agreed that "[i]t is a real thing that white people clap to music on the 1 and 3 counts, where black people clap on the 2 and 4."  Hayley also said, "I wanted to be cute like Cher from Clueless but people just thought I was the babysitter (or alt joke: ppl just looked at me like then unpopular unattractive [*sic*] black character)."  Norman said she tried to fit in by "bleaching my hair and wearing green contacts to try to pass for white and then a month later, when that didn't work, getting cornrows and speaking with an affectation to try to pass as fully black."  Vogel stated that the show represents "a story that has never been told. Anywhere.  On any platform.  I mean, the idea has been touched on, but it's not an identity that's been explored in the way it deserves, reflecting *all* of the dimensions of a modern, mixed-race experience."

In November 2018, Ross and Norman pitched *Tragic* to Showtime, Netflix, HBO, Hulu, Amazon, and Starz as potential financiers.  All six companies eventually passed on *Tragic*.

13

4.    Mixed-ish *is developed as a spinoff of* Black-ish

According to defendants, in August 2018, producer and director Randall Winston pitched a spinoff idea to *Black-ish* creator Barris.  Winston's idea was to do a retrospective, coming-of-age show in the style of *The Wonder Years* depicting Bow's childhood growing up in suburbia with hippie parents of different races.  Winston stated in a declaration that he did not know Norman or Ross, and he was unaware of Norman's ideas involving *Tragic*.  At Barris's request, Dobbins, who also managed Barris, pitched the idea to ABC.[4]

ABC liked the idea, and initially developed it in a script intended for season 5, episode 24 of *Black-ish*, titled "Becoming Bow."  The episode was shot beginning in March 2019. ABC ordered a full season of *Mixed-ish*, and "Becoming Bow" was aired as the first episode of *Mixed-ish* in September 2019.

"Becoming Bow" began with the family from *Black-ish* (Dre, Bow, and some of their children) discussing Bow's childhood. Bow mentioned that she lived on a "commune" and that she never would have met Dre "if the elders hadn't gotten arrested."

The scene flashed back to show Bow as a 12-year-old child, with a voiceover by Ross, stating that her childhood was "anything but normal."  Young Bow was with other people of all ages and races wearing white gowns, dancing together, and holding hands.  Bow's voiceover explained that she lived on a commune, separate from the problems of the rest of the world—a "hippie, judgment-free utopia where love ruled all."  She continued, "There was no racism, no sexism, and everyone was

---

[4]    There was an earlier spinoff of *Black-ish* as well.  In January 2018, a series called *Grown-ish* began to air; it focuses on Bow and Dre's adult daughter, Zoey.

14

truly equal." But the government considered them a "radicalized cult" and raided the compound. Ross's voiceover stated, "In the summer of 1985, I was 12 years old. And my life changed forever."

Young Bow, her parents (Paul and Alicia), her younger brother Johan (age 7), and their younger sister Santamonica (age 5) moved to Paul's father's "rental house" in a nondescript suburb, which Bow said felt like "a whole other planet." Young Bow, Johan, and Santamonica were fascinated with things like electric lights and flush toilets. As the episode progressed, Ross's voiceover explained that her father Paul and mother Alicia met at Berkeley law school; Paul dropped out "as a protest against the glass ceiling of classism," and Alicia graduated. Paul's father, Harrison, was introduced as an "ambulance-chasing multimillionaire owner of a personal injury law firm" who "might've voted for Reagan, but he loved his brown grandkids." Later, Harrison, acting very amped up, said to Alicia, "I do cocaine."

Young Bow and her siblings began attending school, where they were "introduced to the real world." As the three children walked through a cafeteria with black kids sitting on one side and white kids sitting on the other, Ross's voiceover stated that the siblings were faced with "a question that would follow us for the rest of our lives": what it means to be "mixed." The voiceover explained that "growing up on the commune, race wasn't a thing." And because *Loving* did not legalize interracial marriage until the 1960s, Bow and her siblings "were basically the beta testers for biraciality." The voiceover said, "Imagine being the new kid when no one in the world is like you. Not even your parents." Johan and Santamonica each decided to "pick a side"—

15

Johan began sitting with the black kids and Santamonica began sitting with the white kids. Back at home, Bow told her father she was struggling because "I feel like if I choose being white, I'm giving up on mom. And if I choose being black, I'm giving up on you." Both parents reassured Bow that together they would find a way to move forward.

The series remained set in 1985, with Bow as the main character living with her parents and siblings as they attempted to navigate the culture clashes arising from moving from a commune to an American suburb, and from being mixed-race. Ross's voiceovers continued to narrate the episodes and explain historical context. Two extended family members regularly visited the family: Alicia's sister Denise, and Paul's father Harrison, who also became Alicia's boss when she began working for his law firm. Much of the familial conflict centered around the hippie parents' views conflicting with the more mainstream ideas of Denise and Harrison.

Additional parts of *Mixed-ish* are relevant to Norman's claims, including the following. In season 1, episode 2, "The Warrior," while Bow was still torn between choosing to assimilate with the white or black kids at school, she ran through one scenario in which she chose the white side, and a disembodied voice deemed her "as white as can be; I hope you enjoy clapping on the 1 and the 3." Season 1, episode 3, "Let Your Hair Down," focused on the children's hair as school picture day approached, and the children's struggle between being proud of their natural hair versus changing it to fit in with peers and popular styles. Episode 5, "All She Wants to Do is Dance," involved Bow asking her crush, a white boy, to a Sadie Hawkins dance.

Barris, Ross, and Peter Saji were credited with creating *Mixed-ish*.

## B.     Complaint

Norman alleged that in February 2019, she "learned from articles in the press that ABC was in development of a new series, a spin-off of 'Black-ish,' created by, among others, Ross and Barris, to be produced by Artists First, the sister company of Big Breakfast and which represents both Ross and Barris. And, this supposed newly-created show was going to be about exactly what [*Tragic*] is about – a 30-minute sitcom that, employing flashbacks, follows the journey of a mixed race female protagonist as she grapples with her biracial identity while living [in] the suburbs surrounded by both sides of her African American and Caucasian families."  Norman alleged that as she shared her ideas about *Tragic*, "Big Breakfast, Dobbins, and, . . . Ross portrayed themselves as friends and mentors to Norman, while at the same time they were plotting and scheming to steal her show and pass it off as their own."

On September 18, 2020, Norman filed a complaint alleging eight causes of action against Big Breakfast, Ross, Barris, Dobbins, Artists First, and ABC.  Her first cause of action for breach of written contract and second cause of action for breach of the implied covenant of good faith and fair dealing against only Big Breakfast are not at issue in this appeal.  In short, they alleged that Big Breakfast breached its contract with Norman and acted in bad faith by allowing its sister company, Artists First, to exploit *Tragic* without involving or compensating Norman.

In Norman's third cause of action for promissory estoppel against Ross, Norman alleged that Ross "made a clear and

17

unambiguous promise to Norman that she would help guide Norman and ensure that [*Tragic*] would be developed with Ross's experienced knowhow in the entertainment industry." Norman alleged that in reliance on those promises, she shared her creative ideas with Ross and "continued to work with her on the project." Norman alleged she suffered damages as a "direct and proximate result of Ross's actions."

In her fourth cause of action for breach of implied-in-fact contract against Big Breakfast, Ross, Barris, and Artists First, Norman alleged "it was agreed, understood, conveyed by Norman, or otherwise implied, that if any of the above-mentioned parties intended to utilize any element of [*Tragic*, they] would obtain Norman's consent and . . . she would be duly compensated, would be a producer on the series, and would be given both an acting role and proper screen credit." Norman alleged these defendants "breach[ed] the implied contract by accepting the idea" for *Tragic*, "and then proceeding to write, develop, produce, distribute and exploit Norman's submission with [*sic*] obtaining her consent, without compensating her for her submission of these materials, . . . and without giving her an acting role and screen credit."

In her fifth cause of action for breach of confidence against Big Breakfast, Ross, Barris, and Artists First, Norman alleged she provided information about her ideas for *Tragic* with the understanding that these defendants would "treat her ideas and work product as proprietary and confidential," and "would not disclose or otherwise utilize her ideas and work product . . . unless such disclosure and utilization was on her behalf with compensation, an acting role, a producer role, and screen credit." Norman alleged these defendants "intentionally used Norman's ideas and work product . . . to their own advantage in developing

18

'Mixed-ish' [which] constitutes a breach of the confidential relationship between Norman and Defendants."

In her sixth cause of action for intentional misrepresentation against Big Breakfast, Ross, Dobbins, and Artists First, Norman alleged, "Big Breakfast represented to Norman that should Big Breakfast be able to set up Norman's Series with any entity for the purpose of exploiting such series, Norman would be attached to the project as executive producer, writer, and actress. Big Breakfast further represented to Norman during these negotiations and continuing during the term of the Agreement that it would use its best efforts to ensure that Norman's position would be protected and that she would benefit from any sale of her series." Ross and Dobbins also promised to help Norman develop *Tragic*. Norman contended that "[t]hese representations and omissions were false and defendants . . . knew them to be false and fraudulent because defendants . . . knew at the time of some or all of these representations and omissions that they intended to appropriate [*Tragic*] for themselves without having any intention of attaching Norman in any manner to the series 'Mixed-ish.'"

In her seventh cause of action for intentional interference with contract against Ross, Barris, Artists First, and ABC, Norman alleged that she and Big Breakfast had a contract (the term sheet), the named defendants knew of the contract, and they "intended to disrupt and interfere with the performance" of the contract by "engaging in a scheme to rip off" *Tragic*. Norman alleged that defendants knew she would be harmed, and she was in fact harmed.

In her eighth cause of action for inducing breach of contract against Ross, Barris, Artists First, and ABC, Norman alleged the

19

defendants knew about her contract with Big Breakfast, "induced Big Breakfast, and its representatives, not to perform under the terms of the Agreement and to deny Norman all of her benefits outlined by said Agreement." She asserted that the defendants "intended to influence, direct, or cause Big Breakfast to commit the above-described breaches because they knew that each of them would benefit from such breaches. Among other benefits, Ross and Barris are credited as creators of 'Mixed-ish,' Ross is the on-screen narrator of 'Mixed-ish,' Artists First is credited as a producer of 'Mixed-ish,' and ABC is the network on which 'Mixed-ish' airs. Defendants . . . receive revenue from the production and distribution of 'Mixed-ish,- thereby enriching themselves at the expense of Norman."

For each cause of action, Norman asserted she had been damaged "in an amount equal to at least $5,000,000." She also asserted punitive damages allegations. Norman requested restitution of "all monies made pursuant to defendants' unjust enrichment," as well as costs, attorney fees, interest, and any other damages the court deemed appropriate.

## C.    Special motions to strike

All defendants except Big Breakfast filed three special motions to strike under the anti-SLAPP statute, section 425.16: one by ABC, one by Barris, and one by Ross, Dobbins, and Artists First. "Resolution of an anti-SLAPP motion involves two steps. First, the defendant must establish that the challenged claim arises from activity protected by section 425.16. [Citation.] If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*).) "The court does not weigh evidence or resolve

20

conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.'" (*Id.* at pp. 384-385.) When "claims are stricken from the pleadings for lack of merit, [the plaintiff] may no longer seek to impose liability on defendants for having engaged in these protected acts." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1019 (*Bonni*).)

Section 425.16, subdivision (e) describes four categories of protected activities "in furtherance of a person's right of petition or free speech," including "(3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e).)

1. *Step one: Arising from protected activity*

Regarding the first step of the anti-SLAPP analysis, the moving defendants[5] asserted that the gravamen of Norman's claims was that the defendants stole *Tragic* and used it to create

---

[5] The moving defendants are represented by the same counsel, they each incorporated the other motions, and their arguments overlap. We refer to them hereinafter as "defendants." With their motions, defendants filed over 800 pages of supporting documents, and a USB drive containing four full seasons of *Black-ish* and one full season of *Mixed-ish*.

*Mixed-ish*.  They argued that Norman's claims therefore arose from protected activity because *Mixed-ish* was a "written or oral statement . . . made in a place open to the public or a public forum in connection with an issue of public interest" under section 425.16, subdivision (e)(3).  Defendants also asserted that all parts of developing and creating the show, including its casting and any broadcast, constituted conduct in furtherance of free speech in connection with an issue of public interest under section 425.16, subdivision (e)(4).

Defendants noted that the causes of action for promissory estoppel and intentional misrepresentation were based on defendants' actions in collaborating with Norman for purposes of developing *Tragic*, which was protected activity.  Defendants argued that Norman's causes of action for breach of implied-in-fact contract and breach of confidence arose from these defendants' purported use and disclosure of *Tragic* materials in the making of *Mixed-ish*, which was also protected activity.  Finally, they argued that the causes of action for intentional interference with a contract and inducing breach of contract arose from the alleged scheme to "rip off" *Tragic* and in producing *Mixed-ish*, which was protected activity.

2. *Step two: Probability of success*

Moving to the second step of the anti-SLAPP analysis, defendants asserted that Norman did not have a probability of prevailing on any of her causes of action.

Barris submitted a declaration stating that he never received the materials for *Tragic*, and that *Mixed-ish* was created from characters and themes that had been central to *Black-ish* for years: "We developed Bow as a character over many episodes and seasons of *Black-ish*."  Dobbins stated in a declaration that

22

he "never pitched or discussed Tragic/The Girl With The Hair with Mr. Barris, and I never sent any of the materials to him."

Producer and director Randall Winston submitted a declaration that he worked with ABC from about June 2018 to June 2020. He stated that he had long wanted to do a television series about "growing up as an African-American in a largely white suburb during the 1970s and '80s." Winston said he "conceived the idea of producing a television comedy series that would draw upon those experiences, using a *Wonder Years* format," a coming-of-age show narrated retrospectively by an adult looking back on childhood experiences. He "realized that the 'Black Wonder Years' idea could be done through ABC's current television series, *Black-ish*," focusing on Bow's background.

Winston stated that he pitched the idea to Barris the week of August 12, 2018. Winston stated that "Peter Saji, a writer and producer on *Black-ish*, later came on board to co-write the script for the episode that eventually became titled 'Becoming Bow.' The plan was for the episode to be aired as part of *Black-ish* (the final episode of the season then airing), and that based on that episode, ABC network would decide whether or not to order additional episodes or a series." Winston stated that he had never heard of Norman, he had never received Norman's ideas, and he was not aware of any materials relating to *Tragic*.[6]

Syndee Rimes, Vice President of Current Programming for ABC, stated in a declaration that *Black-ish* season 5, episode 24 was titled "Becoming Bow" and was shot starting in March 2019. Rimes stated, "In May 2019, after viewing the episode, ABC

---

[6] Winston's assistant, Daniel Samiljan, submitted a declaration supporting Winston's version of events.

Network ordered it to series, and ABC Network decided to air the 'Becoming Bow' episode as the first episode of" *Mixed-ish*. Rimes also stated, "Big Breakfast was not and has never been involved in the production or distribution of 'Becoming Bow' or *Mixed-ish*. *Mixed-ish* is a spin-off of *Black-ish*, not a television series project called 'Tragic' or 'The Girl With The Hair' relating to Plaintiff or Big Breakfast."

Ross submitted a declaration stating that she had played Dr. Rainbow "Bow" Johnson on *Black-ish* since 2014, and the "fact that Bow is mixed and not completely black has been a running theme starting with the *Black-ish* pilot." Ross stated that like the character Bow, she is also biracial. Ross also noted that she "founded a natural hair product company called Pattern Beauty for people with curly hair," and "[t]he Pattern Beauty product line has been a huge success and well received by many curly/coil/textured-haired consumers."

Ross also stated in her declaration that she was approached about helping to develop *Tragic*, and "[i]n return for contributing to the development, I would be attached to the Tragic Series as an executive producer, conditioned on Big Breakfast being able to set up the series with a Financier (e.g., broadcaster, online streaming platform or studio) and on me reaching an agreement about such attachment with the Financier." Dobbins stated that in late 2017, he received the *Tragic* materials with a request that he send them to Ross. Dobbins did so.

Ross stated that in 2018 she entered into an agreement with Big Breakfast to help develop *Tragic*, and "[o]ver the course of 2018, I contributed my ideas, input, experience, and knowhow to develop Tragic/The Girl With The Hair." Ross stated, "On November 12 and 13, 2018, I participated in two days of pitches

24

of The Girl With The Hair to Showtime, Netflix, HBO, Hulu, Amazon, and Starz as potential Financiers.  I did my best to try to persuade these companies to accept Tragic/The Girl With The Hair.  However, I later learned that all of them had passed."  She continued, "I did not disclose any of the materials, elements, or ideas from Tragic/The Girl With The Hair or anything about Ms. Norman to Kenya Barris, Randall Winston, or Peter Saji.  Nor did I use any of the materials, elements, or ideas from Tragic/The Girl With The Hair or Ms. Norman to create *Mixed-ish*."

Luke Kelly-Clyne, president of Big Breakfast, submitted a declaration stating that for certain projects, "Big Breakfast acquires the exclusive rights to creative projects and content . . . for Big Breakfast to then develop and shop to distributors or other financiers ('Financiers'). . . .  That was the case with the television series project that relates to Plaintiff Hayley Marie Norman, which was initially called 'Tragic.'"  Kelly-Clyne continued, "Big Breakfast had no agreement or understanding with Ms. Norman that Big Breakfast could not, without Ms. Norman's consent, develop or become involved with another project that used elements or ideas also in or relating to Tragic."  Kelly-Clyne discussed reaching out to Ross regarding *Tragic*, and stated, "As Big Breakfast had the exclusive rights to Tragic and owned the development, we did not communicate to Ms. Ross or her manager Brian Dobbins at [Artists First] that the Tragic project or ideas were Ms. Norman's proprietary and confidential information."  He stated that no one at Big Breakfast spoke with Barris or Saji about *Tragic* or sent them any materials regarding *Tragic*.  He also stated, "Big Breakfast did not set up Tragic/The Girl With The Hair, under any title, with ABC Studios or ABC network, either directly or through Artists First, Brian Dobbins,

25

or any other entity or person."  Kelly-Clyne stated that Big Breakfast had no role in developing *Mixed-ish* or any *Black-ish* episodes.

In their special motions to strike, defendants argued that in light of this evidence, Norman could not demonstrate a probability of success.  For the promissory estoppel cause of action, defendants asserted that Ross's alleged promises to "help guide" Norman and "develop" *Tragic* were far from the "clear and unambiguous" promises required for a promissory estoppel claim. They also asserted that Norman could not show detrimental reliance, because the *Tragic* materials were sent to Ross before Ross and Norman spoke, and "Ross's purported promise did not induce 'a change of position.'"

As to Norman's cause of action for breach of implied-in-fact contract, defendants asserted that Norman could not establish that she conveyed her ideas to defendants based on an agreement to pay for those ideas if used.  Defendants argued that based on Norman's agreement with Big Breakfast (BB), she "granted the exclusive rights to all pre-existing materials to BB and agreed to develop Tragic for BB, which BB would own," which undermined Norman's claims that she offered to provide her ideas to defendants for compensation.

Defendants also argued that Norman could not prove defendants used *Tragic* because she could not demonstrate that the two series were substantially similar.  They relied in part on *Ryder v. Lightstorm Entertainment, Inc.* (2016) 246 Cal.App.4th 1064, 1072-1073 (*Ryder*), which states that when a plaintiff alleges the defendants used the plaintiff's ideas without permission, such a claim "requires proof that defendants *used* his [or her] ideas," and "'use' of an idea can be inferred from evidence

26

showing the defendant had access to the plaintiff's idea and the parties' ideas are similar." *Ryder* also requires works to be "substantially similar." (*Id* at p. 1073.)

Defendants asserted that Norman could not make such a showing, and pointed out several differences between the two series. For example, while *Tragic* was intended to be set in the present day, focused on the life of adult Hayley, and include flashbacks to Hayley's past, *Mixed-ish* was entirely set in 1985 and proceeded linearly from the time Bow's family moved from the commune to the suburbs. Another example was that "*Mixed-ish* presents a cohesive nuclear family as the place where identity can safely develop. *Tragic* is the opposite: It stresses dysfunction, familial and personal. Themes about identity and belonging were in *Black-ish*, but in any case, such a broad similarity is not actionable."

Defendants also noted that *Mixed-ish* was based on characters that had been created and developed years before Norman created *Tragic*. Defendants noted that Bow's mixed race and issues of her fitting in with Dre's black family due to her unique background were running themes in *Black-ish*. Defendants argued that certain elements of *Tragic*—such as the mixed-race protagonist addressing issues of belonging, not fitting in, and not knowing which "race" box to pick on a school form— had specifically been explored in the "Being Bow-racial" episode of *Black-ish*. Defendants also noted that *Black-ish* was about a black family living in a majority white suburb.

As to Norman's breach of confidence cause of action, defendants asserted that Norman "cannot show that the Tragic elements allegedly used in *Mixed-ish* were her confidential and novel information, including because Barris had already created

Bow and her backstory in *Black-ish*. The Norman/BB Agreement also gave BB the exclusive rights without an obligation of confidentiality, and BB did not give actual notice to [Artists First] and Ross that the idea of a mixed-race woman grappling with her biracial identity or other ideas were Plaintiff's confidential property."

Regarding Norman's cause of action for intentional misrepresentation, defendants asserted that Norman could not show misrepresentation, detrimental reliance, or damages. Defendants argued that Ross and Dobbins *did* assist in developing *Tragic*, so any alleged promises to help develop *Tragic* could not be misrepresentations. Defendants further asserted that "[t]here was no detrimental reliance, because BB disclosed Tragic to Ross, Dobbins, and AF before they allegedly made any promise, and BB already controlled Tragic" at the time.

Regarding intentional interference with contract and inducing breach of contract, defendants asserted that none of the defendants knew the terms of the contract between Norman and Big Breakfast. They also asserted that Norman could not prove that defendants' actions actually disrupted the contract.

Defendants further asserted that all of Norman's claims were preempted by the Copyright Act.

## D. Norman's motion seeking discovery

Norman moved for an order allowing discovery regarding the creation of *Mixed-ish*; the timing of when defendants were apprised of the existence of the contract between Big Breakfast and Norman; and the relationship between Big Breakfast, Artists First, and their parent company, Electus. Norman asserted that because defendants claimed to have no knowledge of Norman's agreement with Big Breakfast, she should be able to conduct

28

discovery as to what defendants knew and when they knew it. She also asserted that Big Breakfast "is part of a family of companies owned by Electus, LLC, to which Defendant Artists First (also owned by Electus) also belongs, and who Norman alleges were all acting on behalf of one another on the Norman Series." Norman proposed 16 categories of document requests and asked to depose 11 witnesses, including Ross, Dobbins, Barris, and Winston.

Defendants opposed Norman's motion, characterizing it as "fishing-expedition requests for unspecific, sweeping, and highly burdensome discovery." According to a minute order, the court granted the motion for limited discovery, and denied the remainder. There is no clear court order in the record detailing which parts of the motion were granted and which were denied.

## E. Norman's oppositions to the special motions to strike

### 1. *Step one: Arising from protected activity*

In her oppositions to defendants' motions, Norman asserted that the anti-SLAPP statute did not apply to any of her causes of action. She argued that the "gravamen of each cause of action in [the] Complaint is each of the Defendants' failure to compensate her," which "does not implicate the anti-SLAPP statute." She also asserted, "All of Norman's claims arise from Defendants' failure to compensate Plaintiff for use of her ideas. . . . Had Defendants compensated Norman, there would not have been a lawsuit."

Relying heavily on an unpublished case from the Central District of California, *Jordan-Benel v. Universal City Studios, Inc.* (C.D. Cal., June 24, 2015, No. CV-14-5577-MWF MRWX) aff'd (9th Cir. 2017) 859 F.3d 1184, Norman argued, "The failure to compensate Norman pursuant to private interactions between

29

the parties (whether in contracts or tort) is not activity that implicates the anti-SLAPP statute." She also asserted, "it is not the act of making *Mixed-ish* that is the 'principal thrust' of the Complaint, but Defendants' failure to pay for the use of her ideas."

2.     *Step two: Probability of success*

In support of her opposition, Norman submitted a declaration discussing her creation of *Tragic*, and her work with Big Breakfast and Vogel, and eventually Ross, to develop it. She attached various communications with Vogel and Ross, multiple versions of the *Tragic* deck, and her agreement with Big Breakfast.

Norman argued that none of her claims was preempted by copyright law. She also disagreed with defendants' argument about prior creation, asserting, "*Mixed-ish* was not created in a 2016 episode of *Black-ish* merely because a *Mixed-ish* character appeared in a single episode of *Black-ish*."

Norman acknowledged that a substantial similarity finding was required to show use of an idea, but asserted that "finding one substantially similar element is enough." In her declaration, Norman asserted that *Tragic* and *Mixed-ish* included numerous similar elements, including, "The macro-element contained in all of the materials regarding [*Tragic*] . . . includes the 'way in' to the show—meaning flashbacks (*Mixed-ish* is one big flashback) and telling this story from a mixed-race female's viewpoint and having her conflicting black and white backgrounds portrayed by both sides of her white and black family." Norman also included a 30-point detailed list of items that she alleged were similar in the two series, including "the protagonist's desire to fit in and not knowing where she belonged"; "[*Tragic*] opens with a flashback of

30

the main character at 12 years old—*Mixed-ish* begins with the Rainbow character being 12 years old"; interracial dating generally, and specifically 12-year-old Bow asking a white boy to a dance and Hayley's fiancé being white; *Mixed-ish*'s episode about hair on school picture day and Norman's meme about hair on school picture day; "[t]he idea of belonging"; a joke about clapping on the 1 and the 3; the protagonist experiencing self-doubt; not understanding black friends' references; the setting of *Mixed-ish* is suburban and Hayley of *Tragic* grew up in the suburbs; conservative in-laws; grandparents who suffer from addiction; "[t]he whole idea of not being aware of your race is lifted from [*Tragic*]"; feeling like one is forced to "choose sides" or choose a parent; and trying to fit in with racial stereotypes.

Norman asserted in her declaration that when she sent the *Tragic* materials to Vogel at Big Breakfast, she did so "with the understanding that pursuant to the custom and practice of the entertainment industry, they would be kept confidential and not used without payment to me." She stated that according to her November 2017 agreement with Big Breakfast, "I granted BB the right to use the Pre-Existing Materials for the sole purpose of bringing [*Tragic*] to air. Any materials developed during the term of the Agreement (the 'Pitch Materials') were the property of BB subject to a reversionary right in my favor." Norman stated that all rights to the materials had since reverted to her.

Norman stated that after Ross had received the *Tragic* materials, Norman's "goal was to sell the series to Ross by . . . sharing ideas, concepts, and stories about [*Tragic*] directly with her. I understood like I did for my disclosures to BB, that my sharing of my materials was done on a confidential basis and that none of these materials would be used without me being paid

pursuant to the custom in the entertainment industry." Norman argued in her opposition that "Ross knew or should have known that Norman's disclosures were confidential and that Ross could not use the materials disclosed without including and compensating Norman, thus establishing an implied contract." She also argued that her agreement with Big Breakfast had no effect on her ability to contract with defendants.

Norman further contended that she had established her cause of action for breach of confidentiality, because defendants knew the disclosures were confidential. She relied in part on a declaration from an expert witness, Richard Marks, who stated that such materials are typically considered confidential.

Norman asserted that she showed a probability of prevailing on her promissory estoppel and intentional misrepresentation causes of action because "Ross stated, among other things, that she would ensure that Norman would be 'attached' to the production of" *Tragic* but "Norman was not." Norman also asserted that Ross used parts of *Tragic* as creator and executive producer of *Mixed-ish*. Norman further contended that she demonstrated a probability of success on her interference with contract and inducing breach of contract claims because "The interference and the breach are that [*Tragic*], in the disguise of *Mixed-ish*, was made without Norman being compensated."

Norman objected to some of defendants' evidence. Defendants filed replies and supplemental declarations, and also objected to some of Norman's evidence.

## F.    Court ruling

Following a hearing, the trial court issued a written ruling granting the motions in part. The court began with the first step

32

of determining whether the claims arose from protected activity. The court interpreted Norman's fourth cause of action for breach of implied-in-fact contract as a mixed cause of action. It relied on *Jordan-Benel v. Universal City Studios, Inc.* (9th Cir. 2017) 859 F.3d 1184 (*Jordan-Benel*), the Ninth Circuit case affirming the district court case Norman cited. The court agreed with Norman that "[t]he alleged harm is the defendants' failure to pay for the use of the idea. The claim that the defendants failed to pay 'does not challenge the activity of filmmaking at all,'" and therefore did not constitute protected activity under section 425.16. The court concluded that the remainder of Norman's allegations in that cause of action, "the alleged wrongful acts of using the ideas [from *Tragic*] without [Norman's] consent and failing to give [Norman] an acting role, a producing role and screen credit" constituted protected activity under section 425.16.

The court noted that Norman's fifth cause of action for breach of confidence did not include a failure-to-pay element, and therefore did not fall under the *Jordan-Benel* exception. It stated however, that if Norman "intends this cause of action to allege as the wrongful acts a failure to pay and give her an acting role, producer role, and screen credit, then it is duplicative of the fourth cause of action, and the conclusions above apply." The court did not state a clear finding as to whether the step one burden was met for the breach of confidence cause of action. The court also held that Norman's remaining causes of action arose from protected activity, and therefore that defendants met their burden under the first step of the anti-SLAPP analysis.

Turning to the second step, the court held Norman had demonstrated a probability of success on her causes of action for breach of implied-in-fact contract and breach of confidence. The

court stated that Norman's "evidence of the communication and collaboration among [Norman], Ross, and Dobbin[s] allows an inference that Ross and Dobbins accepted the disclosure of her ideas and materials with the understanding [Norman] expected to be involved in the series and paid if they were used. [Citation.] Plaintiff also submitted evidence her ideas were used in 'Mixed-ish.'" However, Norman "did not show she had any communications of any kind with Barris," and "did not show Dobbins was involved in the conversations with her on behalf of Barris." Thus, the court held that Norman demonstrated a probability of prevailing against only Ross and Artists First.

Regarding substantial similarity, the court stated, "The core of both works focus on a mixed-race character trying to figure out how she fits in, dealing with parents of different races, and navigating in white and black worlds. Some of the plot points, such as involving hair and dating a white person, are similar. Both use the 'gimmick' of flashbacks. . . . [H]aving a main character of mixed-race with the theme of the series focusing on what it means to be mixed-race was unusual. . . . There are enough similarities that a jury could [find] the defendants used at least some of [Norman's] ideas, and so the Court cannot conclude as a matter of law that the works are not similar enough." The court cited Norman's declaration in support of this ruling. The court also held that Norman's claims were not preempted by copyright law. For the cause of action for breach of implied-in-fact contract, therefore, the court denied the motion as to Ross and Artists First, and granted the motion as to Barris.

Turning to the cause of action for breach of confidence, the court stated, "To prove a cause of action for breach of confidence, the plaintiff must show she offered an idea to the defendant in

34

confidence, and the defendant voluntarily received the idea in confidence with the understanding that it was not to be disclosed to others and not to be used by the offeree for purposes beyond the limits of the confidence without the offeror's permission." The court stated that Norman "did not show the existence of an implied-in-fact contract to keep the material confidential, because she did not submit evidence that she requested her ideas be kept confidential when she disclosed them to Ross and Dobbins." The court also stated that Norman did not establish that "custom and practice creates a duty of confidentiality," or that any special relationship between her and the defendants gave rise to a duty of confidentiality.

Although these statements would seem to suggest that Norman could not succeed on her breach of confidence cause of action, the court nevertheless stated that Norman "satisfied her minimal burden as to Ross and Artists First, but not as to Barris for the reasons stated above."

The court then turned to the causes of action for promissory estoppel against Ross, and intentional misrepresentation against Ross, Dobbins, and Artists First. The court held that although Norman said in her declaration that Ross made certain promises about guiding her through the process of developing *Tragic*, Norman did not say that she relied on Ross's statements to her detriment. In addition, Norman offered no evidence of misrepresentations by Dobbins. Thus, the court held that Norman failed to show a probability of prevailing on these causes of action.

Turning to the causes of action for intentional interference with contract and inducing breach of contract against Ross, Barris, Artists First, and ABC, the court stated that Norman "did

not submit evidence that Big Breakfast failed to perform or breached its contractual relationship as a result of the defendants' actions." Norman also "did not submit evidence that Big Breakfast would have successfully placed [*Tragic*] with a network or production company if the defendants had not started working on 'Mixed-ish' or that Big Breakfast abandoned her contract because of 'Mixed-ish' or any actions by the defendants." The court therefore granted the motions as to these causes of action.

Ross and Artists First timely appealed the court's order denying their motion as to the causes of action for breach of implied-in-fact contract and breach of confidence. Norman timely cross-appealed the court's order granting the remainder of the motions. The remaining defendants then cross-appealed the court's rulings on their evidentiary objections and Norman's discovery motion.

## G.    **Motion for attorney fees**

Defendants filed motions for attorney fees, which are discussed more fully below. (See § 425.16, subd. (c)(1).) In short, defendants requested a total of $436,196.88 in attorney fees. Norman opposed the motions. In a written ruling, the trial court granted defendants' motions for fees in part. The court awarded defendants a total of $125,000 in attorney fees, and stated, "Because defense counsel did not maintain separate billing records for each Defendant, defense counsel is in a better position to determine how to allocate that award among Defendants."

Judgment was entered in favor of Barris, including $35,714.29 in attorney fees; ABC, including $17,857.14 in attorney fees; and Dobbins, including $8,928.57 in attorney fees.

Norman filed a notice of appeal following the judgments. We consolidated the appeals.

## DISCUSSION

**A.      Legal standards and standards of review**

"A cause of action arising from a person's act in furtherance of the 'right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability' that the claim will prevail." (*Monster Energy Co. v. Schechter* (2019) 7 Cal.5th 781, 788 (*Monster Energy*), citing § 425.16, subd. (b)(1).)  Thus, anti-SLAPP motions under section 425.16 "are evaluated through a two-step process.  Initially, the moving defendant bears the burden of establishing that the challenged allegations or claims 'aris[e] from' protected activity in which the defendant has engaged." (*Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061 (*Park*).)  "If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least 'minimal merit.'" (*Ibid.*)

"We review de novo the grant or denial of an anti-SLAPP motion.  [Citation.]  We exercise independent judgment in determining whether, based on our own review of the record, the challenged claims arise from protected activity.  [Citations.]  In addition to the pleadings, we may consider affidavits concerning the facts upon which liability is based.  [Citations.]  We do not, however, weigh the evidence, but accept plaintiff's submissions as true and consider only whether any contrary evidence from the defendant establishes its entitlement to prevail as a matter of law." (*Park, supra,* 2 Cal.5th at p. 1067.)

**B.    Step one: Arising from protected activity**

In their appeal, Ross and Artists First contend the trial court erred in finding that they failed to meet their step one burden as to parts of Norman's cause of action for breach of implied-in-fact contract.  In Norman's cross-appeal, she contends the trial court also should have included Barris in this finding. Norman further contends the trial court erred in finding that the defendants met their step one burden as to her causes of action for breach of confidence, promissory estoppel, intentional misrepresentation, intentional interference with contract, and inducing breach of contract.

The parties agree that making a television series constitutes protected activity.[7]  (See, e.g. *Musero, supra*, 72 Cal.App.5th at p. 816 ["Creating a television show is an exercise of constitutionally protected expression"]; *Tamkin v. CBS Broadcasting, Inc.* (2011) 193 Cal.App.4th 133, 143 ["The creation of a television show is an exercise of free speech"]; *Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510, 1521 [casting decisions are protected activity]; *De Havilland v. FX Networks, LLC* (2018) 21 Cal.App.5th 845, 860 ["'the First Amendment . . . safeguards the storytellers and artists who take the raw materials of life—including the stories of real individuals, ordinary or extraordinary—and transform them into art, be it articles, books, movies, or plays.'"].)  Thus, to the extent

---

[7]    Notably, Norman has not challenged whether the speech at issue implicated an issue of public interest.  (See, e.g., *FilmOn.com Inc. v. DoubleVerify Inc.*, *supra*, 7 Cal.5th at p. 149; *Musero v. Creative Artists Agency, LLC* (2021) 72 Cal.App.5th 802,  820-823 (*Musero*).)

Norman's claims rest upon communications about developing *Tragic* or the making of *Mixed-ish*, that activity is protected.

  1. *Breach of implied-in-fact contract*

  Norman contends that portions of her claims rely on unprotected activity—that defendants failed to pay her for their use of her ideas.  This is the basis upon which the court partially denied Ross's and Artists First's motion below.  This type of theory is sometimes referred to as a "*Desny* claim," after *Desny v. Wilder* (1956) 46 Cal.2d 715 (*Desny*). There, the Supreme Court said, "An idea is usually not regarded as property." (*Desny*, 46 Cal.2d at p. 731.)  However, "'[e]ven though an idea is not property subject to exclusive ownership, its disclosure may be of substantial benefit to the person to whom it is disclosed.  That disclosure may therefore be consideration for a promise to pay.'" (*Id*. at p. 733.)  Thus, "[t]he person who can and does convey a valuable idea to a producer who commercially solicits the service or who voluntarily accepts it knowing that it is tendered for a price should likewise be entitled to recover." (*Id*. at p. 734; see also *Spinner v. American Broadcasting Companies, Inc.* (2013) 215 Cal.App.4th 172, 184 (*Spinner*) ["Plaintiffs may therefore have a cause of action in contract for disclosing an idea to a defendant that uses that idea without compensation"]; *Musero, supra,* 72 Cal.App.5th at p. 810 ["state law protection for ideas as property rights may exist if there was an express or implied-in-fact contract to pay for the disclosure of an idea"].)

  For a *Desny* claim based on an idea submission, "to prevail on a cause of action for breach of implied-in-fact contract, plaintiffs must show (1) they clearly conditioned the submission of their ideas on an obligation to pay for any use of their ideas; (2) the defendants, knowing this condition before the plaintiffs

disclosed the ideas, voluntarily accepted the submission of the ideas; and (3) the defendants found the ideas valuable and *actually used* them—that is, the defendants based their work substantially on the plaintiffs' ideas, rather than on their own ideas or ideas from other sources." (*Spinner, supra*, 215 Cal.App.4th at p. 184; see also *Esplanade Productions, Inc. v. The Walt Disney Co.* (2023) 93 Cal.App.5th 793, 805 (*Esplanade Productions*).)

The trial court found that Norman had alleged such a claim, in that Norman "wanted her idea to be made into a series. The complaint details the efforts she made shopping it around. [Record citation.] The alleged harm is the defendants' failure to pay for the idea," which was not protected activity. The court continued, "The failure to pay [Norman] was not an act in and of itself in furtherance of free speech rights. [The] speech (the making and distribution of 'Mixed-ish') was a step before or led to the failure to pay. . . ." Thus, "[t]he defendants did not carry their burden of showing that the failure to pay alleged in the fourth cause of action implicates the speech concerns of the anti-SLAPP statute."

In support of its conclusion, the trial court relied on *Jordan-Benel, supra,* 859 F.3d 1184. There, plaintiff Jordan-Benel wrote a screenplay for a film and sent it to United Talent Agency (UTA); "the submission was not gratuitous and was made for the purpose of selling the screenplay to a UTA client." (*Id*. at p. 1187.) Someone at UTA sent the screenplay to another UTA client, who then wrote a script titled The Purge. A film of the same name was made, a sequel was made, and another sequel was in the works at the time of the lawsuit. Jordan-Benel asserted that The Purge was based on the ideas in his

40

screenplay. He sued UTA and others for copyright infringement, breach of implied-in-fact contract, and declaratory relief seeking a determination regarding his rights to credits and payment. (*Ibid*.) The defendants in *Jordan-Benel* filed an anti-SLAPP motion, arguing "that Jordan-Benel's claims arise from the creation, production, distribution, and content of expressive works (*The Purge* films) and that such conduct falls squarely within the ambit of anti-SLAPP." (*Id*. at p. 1189.) The district court denied the motion.

On appeal, the Ninth Circuit noted that Jordan-Benel had significantly limited his claims, and therefore "we only address whether anti-SLAPP applies to Jordan-Benel's implied-in-fact contract claim in which Defendants' failure to pay is the alleged breach." (*Jordan-Benel, supra*, 859 F.3d at p. 1189.) In considering the first step of the anti-SLAPP analysis, the court stated, "Whereas the creation of a film might be the basis for a copyright infringement claim, that act alone will not support an 'idea theft' breach of contract claim because the breach is not the defendant's use of the idea. [Citation.] The breach is captured in that 'extra element'—the failure to pay for the use of an idea after having made an implied promise to pay." (*Id*. at p. 1191.) The court found that "the conduct or act underlying Jordan-Benel's breach of implied-in-fact contract claim is Defendants' failure to pay for the use of the screenplay idea" because "the failure to pay was the specific act of wrongdoing alleged by Jordan-Benel to give rise to a legal claim." (*Ibid*.) The court continued, "Jordan-Benel's claim does not challenge the activity of filmmaking at all. In fact, he desperately wanted the film to be made. Because the 'overall thrust of the complaint' challenges Defendants' failure to pay for the use of his idea, we hold that the

41

failure to pay is the conduct from which the claim arises." (*Ibid*.) The court held that because failure to pay is not protected activity under section 425.16 (*id*. at p. 1193), the defendants' motion was properly denied.

*Jordan-Benel* was decided without our Supreme Court's guidance in *Park* or *Bonni*[8]; the Ninth Circuit noted that at the time, "the anti-SLAPP statute and the California Supreme Court do not definitively answer the question of how to pinpoint the conduct from which a claim arises." (*Jordan-Benel, supra*, 859 F.3d at p. 1190.) We join our colleagues in Division Seven of this district in concluding that the reasoning of *Jordan-Benel* is no longer persuasive in light of that subsequent guidance. (See *Musero, supra*, 72 Cal.App.5th at p. 818.)

The *Jordan-Benel* court considered the essence of the plaintiff's claim to be failure to pay on a contract, based on the court's understanding that it was required to determine which "specific act of wrongdoing [was] challenged by the plaintiff." (*Jordan-Benel, supra*, 859 F.3d at p. 1191.) In *Park* and subsequent cases, however, the Supreme Court has clarified that in a first step anti-SLAPP analysis, "courts should consider the elements of the challenged claim and what actions by the defendant supply those elements." (*Park, supra*, 2 Cal.5th at p. 1063; see also *Bonni, supra*, 11 Cal.5th at p. 1015 ["Courts deciding an anti-SLAPP motion . . . must consider the claim's elements, the actions alleged to establish those elements, and whether those actions are protected"].)

---

8    The Supreme Court's opinion in *Park* was issued on May 4, 2017, several weeks before the Ninth Circuit issued the opinion in *Jordan-Benel* on June 20, 2017. However, the *Park* opinion is not cited in *Jordan-Benel*.

As the *Jordan-Benel* court recognized, the elements of a *Desny* claim require *use* of the allegedly stolen ideas. (See *Jordan-Benel, supra,* 859 F.3d at p. 1191 ["To state a claim for breach of an implied-in-fact contract based on the submission of a screenplay, a plaintiff must allege that: (1) he submitted the screenplay for sale to the defendants; (2) he conditioned the use of the screenplay on payment; (3) the defendants knew or should have known of the condition; (4) the defendants voluntarily accepted the screenplay; (5) the defendants actually used the screenplay; and (6) the screenplay had value."].) Thus, any duty to pay Jordan-Benel necessarily arose because the defendants allegedly *used* his ideas in making The Purge films, which constituted protected activity. If there was no use of the ideas, there was no duty to pay; the two actions are inextricably intertwined within the theory of liability. The Ninth Circuit's focus on one of these elements—duty to pay—to the exclusion of the other—use—does not comply with the Supreme Court's guidance on first-step anti-SLAPP analysis.

The *Jordan-Benel* court also focused on the failure-to-pay aspect of the plaintiff's claim because that "extra element" set it apart from a copyright claim. (*Jordan-Benel, supra*, 859 F.3d at p. 1191.) In essence, the court concluded that because a single element of the plaintiff's claim involved non-protected activity, the defendants could not meet their step one burden. However, "[a]s *Bonni* and *Baral* instruct, whatever the purported 'target' of a cause of action, if protected speech activity supplies an element of the claim, the burden shifts to the plaintiff to demonstrate a reasonable probability of prevailing on the merits." (*Musero, supra*, 72 Cal.App.5th at p. 819; see also *Baral, supra*, 1 Cal.5th at p. 396 ["When relief is sought based on allegations of both

43

protected and unprotected activity, the unprotected activity is disregarded at this stage"].) Thus, if a single element of a claim does not involve protected activity, but the remaining elements of that claim do, the step one burden has been met.

Here, the trial court followed the reasoning of *Jordan-Benel*, finding that the protected activity—the making and distribution of *Mixed-ish* by allegedly using Norman's ideas—"was a step before or led to the failure to pay," and did not "transform the wrongful failure to pay into an act in furtherance of free speech." This was error. Assuming that Norman sufficiently alleged a *Desny* claim, the elements of that claim include that "the defendants found the ideas valuable and *actually used* them—that is, the defendants based their work substantially on the plaintiffs' ideas, rather than on their own ideas or ideas from other sources." (*Spinner, supra,* 215 Cal.App.4th at p. 184.) Use of those ideas allegedly occurred in the production of *Mixed-ish*, which was protected activity.

"The defendant's first-step burden is to identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute." (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 884.) Because defendants did so here, the trial court erred in finding that Ross and Artists First did not meet their first-step burden as to a portion of the cause of action for breach of implied-in-fact contract. We also reject Norman's contention that Barris failed to meet his first-step burden as to this cause of action.

2. *Breach of confidence*

In her breach of confidence cause of action against Big Breakfast, Ross, Artists First, and Barris, Norman alleged she disclosed her ideas about *Tragic* to defendants with an

44

understanding that they would "treat her ideas and work product as proprietary and confidential and to be utilized by Defendants . . . to evaluate her ideas or to otherwise develop her proposed project with her." Norman further alleged, "The fact that Defendants . . . intentionally used Norman's ideas and work product . . . to their own advantage in developing 'Mixed-ish' constitutes a breach of the confidential relationship between Norman and Defendants." Notably, there is no communication alleged in the breach of confidence cause of action that does not involve the development of *Tragic* or the making of *Mixed-ish*. The trial court found that "the use of [Norman's] ideas is the wrongful act in this cause of action, and that act was in furtherance of speech rights—the making of 'Mixed-ish.'"

Norman argues the court's finding was error, because "the use of Norman's materials to make *Mixed-ish* forms no part of the elements necessary to form a claim for breach of confidence."[9] This contention contradicts her complaint, which stated that making *Mixed-ish* constituted the alleged breach. Norman also cites no authority for this argument, which contradicts case law holding that "a cause of action for 'breach of confidence' requires a finding that [the defendants] actually used [the plaintiff's] confidential information to their benefit." (*Hollywood Screentest of America, Inc. v. NBC Universal, Inc.* (2007) 151 Cal.App.4th 631, 651 *(Hollywood Screentest)*; see also *Esplanade Productions, supra,* 93 Cal.App.5th at p. 805 [a plaintiff's breach of confidence claim required a showing that the defendant "actually used [the plaintiff's] ideas." As discussed above, the making of *Mixed-ish* constitutes protected activity.

---

[9]     Norman does not challenge the court's grant of the motion for this cause of action as it pertains to Barris.

45

Norman further contends the disclosure of *Tragic* materials is not protected because "the act of disclosing a confidence does not implicate free speech rights." She likens such communication to "incitement or yelling 'fire' in a crowded theater"—communications that may fall outside the protections of the First Amendment. We are not persuaded. First, the defendants' communications regarding the development of *Tragic* are not comparable to inciting violence or creating panic by shouting "fire" in a crowded theater, which are entitled to only limited First Amendment protection due to their immediate effect on public safety. Second, even allegedly wrongful speech is entitled to the protection of section 425.16. (See, e.g., *Collier v. Harris* (2015) 240 Cal.App.4th 41, 54 ["courts have consistently held acts a plaintiff alleges are unlawful or illegal are nonetheless protected activity under the anti-SLAPP statute if the acts assist or facilitate the defendant's free speech rights"].) Thus, defendants met their first-step anti-SLAPP burden as to the cause of action for breach of confidence.

3.      *Intentional misrepresentation and promissory estoppel*

Norman argues the trial court erred in finding that her causes of action for intentional misrepresentation and promissory estoppel against Ross arose from protected activity.[10]  She asserts these causes of action "do not arise from the making and distribution of *Mixed-ish*, but from the broken promises and fraudulent misrepresentations [Ross] made to Norman" that Norman "would be paid."

_____

[10]    Although Norman also asserted her cause of action for intentional misrepresentation against Dobbins and Artists First, she challenges the ruling only as it pertains to Ross.

46

All communications alleged in the intentional misrepresentation and promissory estoppel causes of action involve the development of *Tragic*. Norman alleged that Ross agreed to mentor her and promised to help Norman develop and pitch *Tragic*. Norman did not allege any communications aside from those involving the development of *Tragic* and *Mixed-ish*, which the parties agree constitutes protected activity.

Norman contends that "[f]ailure to act on promises and misrepresentations cannot implicate the anti-SLAPP statute as a matter of law." Again, Norman's argument contradicts legal authority. (See, e.g., *Navellier v. Sletten* (2002) 29 Cal.4th 82, 93 ["fraud claims are not categorically excluded from the operation of the anti-SLAPP statute"]; *Bonni, supra*, 11 Cal.5th at p. 1025 [an allegation that communications involved fraud "does not remove them from the definition of protected activity"]; *Suarez v. Trigg Laboratories, Inc.* (2016) 3 Cal.App.5th 118, 124 ["Misrepresentation or failure to disclose can be protected petitioning activity for purposes of section 425.16"].) Ross therefore met her first-step burden as to the causes of action for intentional misrepresentation and promissory estoppel.

4. *Intentional interference with contract and inducing breach of contract*

Finally, Norman asserts that her causes of action for intentional interference with contract and inducing breach of contract against Ross, Artists First, and ABC did not arise out of protected activity.[11] In the cause of action for intentional interference with contract in her complaint, Norman alleged that

---

[11] Although Norman also asserted these causes of action against Barris, she challenges the ruling only as it pertains to Ross, Artists First, and ABC.

47

she and Big Breakfast had a contract/agreement, and the other defendants "intended to disrupt and interfere with the performance of the Agreement, and did in fact disrupt and interfere with such performance, by, among other things, engaging in a scheme to rip off [*Tragic*] which is the subject matter of the Agreement." In her cause of action for inducing breach of contract, Norman alleged the defendants "induced Big Breakfast, and its representatives, not to perform under the terms of the Agreement and to deny Norman all of her benefits outlined by said Agreement." She further alleged that the defendants "cause[d] Big Breakfast to commit the above-described breaches because they knew that each of them would benefit from such breaches. Among other benefits, Ross and Barris are credited as creators of 'Mixed-ish,' Ross is the on-screen narrator of 'Mixed-ish,' Artists First is credited as a producer of 'Mixed-ish,' and ABC is the network on which 'Mixed-ish' airs. Defendants, and each of them, receive revenue from the production and distribution of 'Mixed-ish,' thereby enriching themselves at the expense of Norman."

On appeal, again relying on *Jordan-Benel*, Norman asserts it is "the failure to pay, and only the failure to pay, that is alleged as the damage to Norman in these causes of action," and "[a]s such, the anti-SLAPP statute is not implicated." For the reasons discussed above regarding Norman's breach of implied-in-fact contract, we are not persuaded by the reasoning of *Jordan-Benel*. Moreover, the defendants' activities upon which these causes of action are based involve the alleged use of Norman's ideas in the making of *Mixed-ish*, which is protected activity. Defendants therefore met their step one burden as to the causes of action for

48

intentional interference with contract and inducing breach of contract.

Finding that defendants met their burden on the first step of the anti-SLAPP analysis as to all six of the challenged causes of action, we turn to step two.

## C.  Step two: Probability of success

Under section 425.16, after a defendant meets its first-step burden, "'the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.  [T]his second step [is] a "summary-judgment-like procedure." [Citation.]  The court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law.  [Citation.]  "[C]laims with the requisite minimal merit may proceed."'" (*Monster Energy, supra,* 7 Cal.5th at p. 788, quoting *Baral, supra*, 1 Cal.5th at pp. 384-385.)

Norman contends she demonstrated a probability of success for each cause of action, and therefore the trial court should have denied defendants' special motions to strike.

### 1.  *Breach of implied-in-fact contract*

#### a.  Existence of a contract

Defendants assert that Norman failed to demonstrate a probability of prevailing on her cause of action for breach of implied-in-fact contract because she cannot demonstrate that the parties had an agreement.  They assert Norman did not offer her ideas to defendants for sale, nor did defendants accept her ideas on the condition that Ross or Artists First were expected to pay

49

Norman for them. We agree the evidence does not establish an implied-in-fact contract.

A breach of implied-in-fact contract cause of action requires the plaintiff to demonstrate that she "clearly conditioned the submission of [her] ideas on an obligation to pay for any use of [her] ideas," and "the defendants, knowing this condition before the plaintiff[ ] disclosed the ideas, voluntarily accepted the submission of the ideas." (*Esplanade Productions, supra*, 93 Cal.App.5th at p. 805; see also *Mann v. Columbia Pictures, Inc.* (1982) 128 Cal.App.3d 628, 647 fn. 6 [a breach of implied-in-fact cause of action requires a plaintiff to show "[t]hat before plaintiff submitted her ideas to the defendants, she clearly conditioned her disclosure upon defendants' agreement to pay for those ideas of plaintiff's which the defendants used, if any"].) "The law will not in any event, from demands stated subsequent to the unconditioned disclosure of an abstract idea, imply a promise to pay for the idea, for its use, or for its previous disclosure." (*Desny, supra,* 46 Cal.2d at p. 739.) Moreover, "the creation of an implied-in-fact contract between an author, on the one hand, and an agent, producer, or director, on the other hand, is of such a personal nature that it is effective only between the contracting parties." (*Rokos v. Peck* (1986) 182 Cal.App.3d 604, 617.)

The evidence shows that Norman entered into a written contract with Big Breakfast, which gave Big Breakfast exclusive rights to *Tragic* at the times relevant here. Big Breakfast then shared *Tragic* with Artists First and Ross months before Norman ever spoke to Ross. Dobbins stated in his declaration that he was not told of any conditions relating to the *Tragic* materials, and Kelly-Clyne stated in his declaration that he did not tell Dobbins the *Tragic* materials were Norman's proprietary property. Ross

entered into a written agreement with Big Breakfast to help develop *Tragic* and pitch it to financiers, which she did. This evidence does not support a finding that Ross and Artists First agreed to receive *Tragic* pursuant to an agreement that they were expected to pay Norman for her ideas.[12] (See *Gunther-Wahl Productions, Inc. v. Mattel, Inc.* (2002) 104 Cal.App.4th 27, 43 ["the particular facts in the case at bench *must* be part of the consideration in deciding whether there is an implied-in-fact contract"]; *Donahue v. Ziv Television Programs, Inc.* (1966) 245 Cal.App.2d 593, 606 ["'the circumstances preceding and attending disclosure'" are relevant to whether there is a contract, quoting *Desny, supra*, 46 Cal. 2d at p. 739].)

Moreover, Norman asserted that *Tragic* could be used only upon her express consent and involvement, further suggesting that she was not offering *Tragic* under the condition of obligation for payment from defendants. In her complaint, Norman alleged that when she shared the *Tragic* materials, it was "understood . . . that if any of the [defendants] intended to utilize any element of [*Tragic*] . . . in writing, developing, producing, distributing,

---

[12] Norman contends that "the custom and practice of the entertainment industry" can be relied upon to conclude that defendants knew or should have known that Norman expected to be paid. We have not found legal authority directly supporting this proposition, and Nimmer on Copyright rejects the contention: "[I]nsofar as creating an implied contract from whole cloth is concerned, the better view is that industry custom does not do it. It would seem that no other viewpoint could pass muster under *Desny v. Wilder*." (5 Nimmer on Copyright § 19D.05 (2024).) Even if industry custom could be relied upon in certain circumstances, it would not preempt the evidence here that Ross and Artists First did not accept the submission of *Tragic* based on any condition of payment.

broadcasting another television program, that they . . . would obtain Norman's consent and in the event that they . . . did so, she would be duly compensated, would be a producer on the series, and would be given both an acting role and proper screen credit." Norman reiterated this position in a declaration filed in support of her discovery motion: "On January 5, 2018, I met with Ross for the first time. I told Ross that under my Agreement with BB, I was attached to the project as an Executive Producer, writer and actor, and that [*Tragic*] could not be made without me."

Defendants assert this case is therefore similar to *Faris v. Enberg* (1979) 97 Cal.App.3d 309 (*Faris*), in which the plaintiff, Faris, conceived of a sports quiz show that he wanted to produce, and approached defendant Enberg, a local sports announcer, about participating in the show as a "master of ceremonies." (*Id.* at pp. 314-315.) After the defendant appeared as part of a similar show, plaintiff sued him for breach of implied-in-fact contract and breach of confidence. (*Id.* at p. 316.) The Court of Appeal affirmed summary judgment for the defendant, stating, "[Faris] never thought of selling his sports quiz show idea to anyone including Enberg. He appears at all times to have intended to produce it himself, and sought out Enberg, as a master of ceremonies. . . . Plaintiff never intended to submit the property for sale and did not tell Enberg that he was submitting it for sale." (*Id.* at pp. 318-319; see also *Aliotti v. R. Dakin & Co.* (9th Cir. 1987) 831 F.2d 898, 902 [under California law regarding implied-in-fact contract, "no contract may be implied where an idea has been disclosed not to gain compensation for that idea but for the sole purpose of inducing the defendant to enter a future business relationship."].)

Norman's claim is similar to the one in *Faris* in that the evidence does not show she offered *Tragic* to Ross and Artists First based on an expectation that those defendants would pay her, nor is there any evidence that the defendants accepted the *Tragic* materials on that basis. Instead, the evidence shows that *Tragic* was submitted to Ross and Artists First for the purpose of collaborating and seeking a financier. Norman therefore has not demonstrated the existence of an implied-in-fact contract between her and Ross or Artists First.

b. Defendants' use of plaintiff's idea

Defendants also contend the trial court erred in finding that Norman demonstrated that *Tragic* and *Mixed-ish* were substantially similar. The trial court found that Norman "submitted evidence her ideas were used in 'Mixed-ish.'" The court stated that the "similarities includ[e] the basic theme (mixed-race woman using her past experiences as a 12-year-old to confront her current life), use of flashbacks, plots (dating outside one's race, hair, microaggressions, not fitting in), supporting characters (extremely conservative in-laws), and the desire of the main character to fit in as she feels she does not know where she belongs." The court also rejected defendants' contention that most of the alleged similarities in the two shows already existed in *Black-ish*. The court therefore found that Norman met her second-step burden, and denied defendants' motion as to Ross and Artists First. Defendants contend this holding was erroneous. We agree.

As noted above, "to prevail on a cause of action for breach of implied-in-fact contract, plaintiffs must show . . . the defendants found the ideas valuable and *actually used* them—that is, the

53

defendants based their work substantially on the plaintiffs' ideas, rather than on their own ideas or ideas from other sources." (*Spinner, supra*, 215 Cal.App.4th at p. 184; see also *Esplanade Productions, supra,* 93 Cal.App.5th at p. 805.) "Regardless of the legal theory used to impose an obligation on the idea-recipient, the recipient is legally obligated to pay only if the idea that the recipient used was the one actually received from plaintiff." (5 Nimmer on Copyright § 19D.07 (2023).)

In the absence of direct evidence, use of an idea "can be inferred from evidence showing the defendant had access to the plaintiff's idea and the parties' ideas are similar." (*Ryder, supra*, 246 Cal.App.4th at p. 1073.) Because it is undisputed that Ross and Artists First had access to Norman's ideas, the focus here is on similarity.

To raise an inference of use, "the works must be *substantially* similar." (*Ryder, supra*, 246 Cal.App.4th at p. 1073.) "[T]he common knowledge of the average reader, observer, spectator or listener is the standard of judgment which must be used. [Citations.] For purposes of comparison therefore the works must be viewed as a whole 'without dissection and without expert or elaborate analysis.'" (*Klekas v. EMI Films, Inc.* (1984) 150 Cal.App.3d 1102, 1111.) If the court finds that "no rational jury could conclude the actionable elements" are similar, such a finding "defeats an inference of use as a matter of law." (*Ryder, supra*, 246 Cal.App.4th at p. 1073; see also *Spinner, supra*, 215 Cal.App.4th at p. 185-186 ["The framework for proving use in an idea submission claim is parallel to the framework for showing copying in a copyright claim. . . . We . . . look to analogous copyright cases for guidance, in addition to idea submission cases"].)

54

Norman urges us to employ the "inverse ratio" standard. Under that rule, "Where there is strong evidence of access, less proof of similarity may suffice. Conversely, if the evidence of access is uncertain, strong proof of similarity should be shown before the inference of copying may be indulged." (*Golding v. R.K.O. Pictures* (1950) 35 Cal.2d 690, 695.) Norman then relies on *Fink v. Goodson-Todman Enterprises, Ltd.* (1970) 9 Cal.App.3d 996 (*Fink*) to argue that she only "need[s] one similarity" to prevail, and that "finding one substantially similar element is enough."

*Fink* does not support Norman's contention. In that case, the plaintiff alleged contract and copyright causes of actions arising from alleged idea theft. The case reached the Court of Appeal following a demurrer, so the court was considering whether the causes of action had been adequately pled. The court considered "whether, as a matter of law, it cannot be said that defendants have appropriated and used[ ] a qualitatively important part of plaintiff's material in such a way that features discernible in defendants' work are substantially similar thereto." (*Fink, supra*, 9 Cal.App.3d at p. 1007.) The court looked at the "basic theme" of the works, the " detailed exposition (through the combination of the presentation and pilot script) of the back story," "the plots for 15 of an estimated 39 weekly episodes" of the relevant television series, and certain "portrayal techniques" such as a dream sequences, use of flashbacks, "use of the signature and talisman devices," interactions between episode plots and back story, and use of music to create atmosphere. (*Id.* at p. 1011.) The court did not, as Norman suggests, hold that evidence of *substantial* similarity was not required in an idea theft case, or

55

that a single similar element was sufficient to support an inference of use.

Moreover, legal authority developed in the five decades since *Fink* was decided does not support Norman's position. Indeed, in idea theft cases "[c]ourts have specifically rejected the contention that liability could be imposed on defendants on the basis of less than substantial similarities." (5 Nimmer on Copyright § 19D.08 (2023).) The Ninth Circuit recently rejected the inverse ratio rule in a copyright case, finding that it created the type of uncertainty underlying Norman's arguments here. The Ninth Circuit stated that the inverse ratio rule "is not part of the copyright statute, defies logic, and creates uncertainty for the courts and the parties." (*Skidmore as Trustee for Randy Craig Wolfe Trust v. Led Zeppelin* (9th Cir. 2020) 952 F.3d 1051, 1066.) The court found that the inverse ratio rule was unhelpful to a copyright analysis, because "[a]ccess does not obviate the requirement that the plaintiff must demonstrate that the defendant actually copied the work." (*Id*. at p. 1069.) The court noted, "[W]e are not suggesting that access cannot serve as circumstantial evidence of actual copying in all cases; access, however, in no way can prove substantial similarity." (*Id*. at p. 1069.)

We need not address the applicability of the inverse ratio rule generally. Under the circumstances here, although it is undisputed that some defendants had access to Norman's work, that access does not obviate the substantial similarity requirement. We therefore follow the many cases holding that in an idea theft case, a plaintiff may raise an inference of use by proving access to the plaintiff's ideas and that the defendant's work is substantially similar to the plaintiff's ideas. (See, e.g.,

56

*Esplanade Productions, supra*, 93 Cal.App.5th at pp. 805-806; *Spinner, supra*, 215 Cal.App.4th at pp. 184-185; *Ryder, supra*, 246 Cal.App.4th at p. 1073; *Hollywood Screentest, supra*, 151 Cal.App.4th at p. 646; *Sutton v. Walt Disney Productions* (1953) 118 Cal.App.2d 598, 603.)

The trial court found that *Tragic* and *Mixed-ish* were substantially similar because "the core of both works focuses on a mixed-race character trying to figure out how she fits in, dealing with parents of different races, and navigating in black and white worlds. Some of the plot points, such as involving hair and dating a white person, are similar. Both use the 'gimmick' of flashbacks."[13]

Defendants note that the mixed-race character of Bow, her family, and her struggles to fit in were developed in *Black-ish* generally and in the *Black-ish* episode "Being Bow-racial" specifically. They argue that because these elements existed before *Tragic*, they should be "filtered out" of the substantial similarity analysis, as the Court of Appeal did in *Ryder, supra*, 246 Cal.App.4th at p. 1074.

---

[13] Norman's declaration was the only evidence the trial court cited in its finding regarding substantial similarity. Defendants argue the trial court erred in overruling their objections to Norman's declaration, and in relying on Norman's characterizations of the evidence rather than the evidence itself. The admissibility of Norman's statements does not affect our findings, and therefore we need not address defendants' evidentiary objections here. However, we do agree that the court was obligated to consider the works themselves, not only Norman's characterization of them. It is unclear whether the court did so.

In *Ryder*, writer and director James Cameron created the story that eventually became the film Avatar (20th Century Fox 2009). In 1995, Cameron recorded his ideas in "a detailed 102-page 'scriptment,' which he describes as a 'highly detailed script-length treatment that, like a treatment, was in a narrative rather than dialogue form, and laid out the story, characters, setting and many of the visual images for Avatar in great detail.'" (*Id*. at p. 1068.) Between 1996 and 1998, plaintiff Eric Ryder wrote a science fiction short story called "KRZ 2068" (KRZ). Ryder shared the story with people at Lightstorm Entertainment, and they worked on revising and preparing the story for a pitch; ultimately Lightstorm passed on the project. (*Ryder, supra*, 246 Cal.App.4th at pp. 1069-1070.) Ryder later sued Cameron and Lightstorm, alleging that they "fraudulently expressed interest in developing . . . KRZ and used parts of that story in Cameron's 2009 film Avatar." (*Id*. at p. 1067.) The trial court granted the defendants' motion for summary judgment.

On appeal, in considering substantial similarity between Avatar and KRZ, the court stated, "The preexisting elements in the Avatar scriptment are not actionable because defendants would not have 'used' those same elements from Ryder's later-created KRZ. Thus, we 'filter out' those preexisting elements in assessing the similarity of the works." (*Ryder, supra*, 246 Cal.App.4th at p. 1074.) The court relied on a copyright case, *Murray Hill Publications, Inc. v. Twentieth Century Fox Film Corp*. (6th Cir. 2004) 361 F.3d 312, 326, which stated, "[W]here defendant owns a prior work containing the same elements, he has no reason . . . to copy wrongfully from another what he could legally copy from himself. Therefore, where an element occurs both in the defendant's prior work and the plaintiff's prior work,

58

no inference of copying can be drawn." (*Ryder, supra*, 246 Cal.App.4th at pp. 1074-1075.)

Although *Ryder* was not a copyright case, Norman argues its reasoning has no place outside of copyright law, because parties may contract for anything—even the development of non-original ideas. (See, e.g., *Chandler v. Roach* (1957) 156 Cal.App.2d 435, 442 ["The producer and the writer should be free to make any contract they desire to make with reference to the buying of the ideas of the writer"]; *Weitzenkorn v. Lesser* (1953) 40 Cal.2d 778, 791 [a plaintiff may prove the defendants agreed "to pay for [the plaintiff's] composition if they used it, or any portion of it, regardless of its originality"].) Nevertheless, in an idea theft case the plaintiff must show that "'the defendants based their work substantially on the plaintiffs' ideas, *rather than on their own ideas* or ideas from other sources.'" (*Esplanade Productions, supra*, 93 Cal.App.5th at p. 805, quoting *Spinner, supra*, 215 Cal.App.4th at p. 184 [emphasis added].) The recipient of an idea "is legally obligated to pay only if the idea that the recipient used was the one actually received from plaintiff." (5 Nimmer on Copyright § 19D.07 (2023).)

Thus, in a case like *Ryder* or this one, where there is evidence that the defendants created certain characters and story lines *before* the plaintiff created or shared her ideas, filtering out those preexisting elements is appropriate.[14] If the defendants had

_____

[14] The trial court found that there were "differences between the highly detailed scriptment in *Ryder* and the preexisting general concepts at issue here." We agree that as a practical matter, preexisting elements must be developed to a certain level of detail to allow a court to determine which factors to filter out. But we disagree that characters whose existence, background,

already begun to develop those ideas before receiving them from the plaintiff, there can be no liability for the alleged theft of such ideas.[15]

Thus, we filter out elements that defendants had already created and used in *Black-ish* before Norman shared her ideas about *Tragic*.[16] *Black-ish* developed the character of Bow, a mixed-race woman with a black parent and a white parent. The black parent and white parent are in an interracial relationship; the episode "Being Bow-racial" also specifically addressed interracial dating. That episode further showed that, while growing up, Bow grappled with fitting in and what it means to be half-black and half-white in America, including not knowing which race box to check on a school form. She experienced microaggressions and misunderstandings from others. We

and family relationships had been developed over several seasons of a series, as well as a completed and aired episode specifically addressing Bow's background, were somehow too general or undeveloped to allow the court to filter out these preexisting elements.

[15] Conceivably, there could be liability despite preexisting elements where, for example, the defendants created characters and a general story line, asked the plaintiff to further develop those specific ideas, and then used the plaintiff's work without compensation. Such a scenario has not been alleged here.

[16] We are not employing the independent creation doctrine, which holds that inference of use can be dispelled by evidence of independent creation. (See, e.g., *Hollywood Screentest, supra,* 151 Cal.App.4th at p. 646; *Teich v. General Mills, Inc.* (1959) 170 Cal.App.2d 791, 799-800.) Although defendants presented evidence that *Mixed-ish* was created independently by Winston and Barris, who both stated that they never saw the *Tragic* materials, defendants acknowledged to the trial court that they had not fully developed this defense.

therefore reject Norman's argument that the following elements support a substantial similarity finding: involvement of "a mixed-race woman who grew up in the suburbs," "dating outside your race," undefined "microaggressions felt by the main role," "the challenges of a mixed-race person such as not fitting in [and] not knowing what box to check when asked one's race," the main characters' "desire to fit in and not knowing where she belongs."

Notably, these are very general, high-level elements. Even if they were not filtered out as preexisting elements, they would be of limited use in a substantial similarity analysis. (See, e.g., *Ryder, supra,* 246 Cal.App.4th at pp. 1077-1078 [certain elements are "too obvious and insubstantial to be an actionable similarity"]; *Klekas v. EMI Films, Inc.* (1984) 150 Cal.App.3d 1102, 1112-1113 ["the subjects of friendship, courage, honor and the effect of war on the human spirit" were general and "not protectible material in and of themselves"]; *Corbello v. Valli* (9th Cir. 2020) 974 F.3d 965, 975 [in the copyright context, "[n]on-protectable elements include . . . *scenes-a-faire* (that is, 'situations and incidents that flow necessarily or naturally from a basic plot premise' or generic plot line) and '[f]amiliar stock scenes and themes that are staples of literature'"].)

Norman asserts that touching on these themes as a small part of *Black-ish* is not the same as developing an entire series out of these elements. We agree that the depth of treatment in each of the works is a relevant consideration. Thus, we examine how Norman and defendants built upon these basic themes in *Tragic* and *Mixed-ish* to determine whether Norman has presented evidence upon which a rational jury could conclude that the two works are substantially similar. (See *Ryder, supra,*

61

246 Cal.App.4th at p. 1073; *Spinner, supra*, 215 Cal.App.4th at p. 185.).

Although there are no bright-line rules for determining substantial similarity, we rely on guidance from previous cases that made substantial similarity findings. (See, e.g., *Weitzenkorn v. Lesser, supra*, 40 Cal.2d at p.791 [comparing the "form and manner of expression"; "the 'basic dramatic core'"; the "combination of characters, locale and myth"; and the "characterizations, descriptions, and events"]; *Henried v. Four Star Television* (1968) 266 Cal.App.2d 435, 436 [reviewing for commonalities in "plot, motivation, subject matter, milieu, and characterization"]; *Minniear v. Tors* (1968) 266 Cal.App.2d 495, 505 [examining whether there were "similarities in basic plot ideas, themes, sequences and dramatic 'gimmicks'"]; *Ryder, supra*, 246 Cal.App.4th at pp. 1076-1079 [comparing in the two works the role of the main characters, characters' motivations, interactions between characters, "significant plot point[s]," specific scenes, and use of technology].)

We begin by considering the basic themes and tones of the two series. The basic theme of *Tragic* centered around adult main character Hayley's life in the present day, starring Norman as a fictionalized version of herself. Different pitches/decks listed Hayley's job as a journalist or an actor. *Tragic* was to be "[a]n unflinching, self-deprecating depiction of the minutiae of Hayley's everyday life." *Tragic* included many references to current issues such as Hayley's half-sister Jazmyn being "Black Twitter famous," videos going viral, Hayley's future in-laws being Trump supporters, Black Lives Matter, and #OscarsSoWhite. The show was intended to be edgy and adult, with the pilot episode focusing on Hayley getting caught lying and stealing. The deck included

jokes such as, "[C]an Hayley really claim that she's pro-black when her own fiancé is white? Even her pussy is colonized!" and Jazmyn being "eager to date but can't seem to find a black man she doesn't think is a 'fucknigga.'" One episode proposal suggested that Sam, a former heroin addict, was curious about trying ayahuasca; Hayley tries it and has a bad trip.

*Mixed-ish*, on the other hand, centered around Bow as a 12-year-old child in 1985. She was innocent and naïve after growing up on the utopian commune, and was learning about the "real world" while attending elementary/middle school for the first time.[17] The series was wholesome and family friendly. Bow was kind to others and a peacemaker. In the second episode, for example, Bow tried to employ conflict resolution skills to help other students at school get along, and she dragged a new table into the cafeteria so she and a Latina friend could sit together without choosing the black or white side. Conversation around the family dinner table focused on how each family member made the world a better place that day. Plots included whether the children would be able to go trick-or-treating like their friends, and the children not knowing about Christmas because the commune celebrated winter solstice instead. Because the series was set in the mid-1980's, there were no cell phones, no social media, and no references to current events. Historical concepts such as affirmative action were explained via voiceover, and events of the time—the Challenger disaster, ozone layer depletion—were addressed.

---

[17] In the first season of *Mixed-ish*, Bow is in seventh grade and attends the same school as Johan, age 7, and Santamonica, age 5.

Both shows focused on family relationships, but the relationships were not similar.  In *Tragic*, Hayley "tries to bridge her two disparate families, but in doing so usually creates more unrest and confusion. In every scenario, she'll be the odd person out, seeking a way to deal with otherness."  Hayley's white mother was portrayed as neurotic and living with her codependent and clueless white boyfriend/husband.  Hayley did not grow up with her father or Jazmyn.  Jazmyn was "image conscious to the extreme" and played to her social media following.  Hayley lived with her white fiancé, Sam; he was from a "Trump supporting Evangelical family in the corn fields of Illinois."  The season arc showed the couple planning their wedding, but experiencing increasing strain in their relationship and calling off the wedding when their "families clash, a fight erupts, and Hayley and Sam are forced to take opposite sides."

In *Mixed-ish*, on the other hand, the family was cohesive and supportive.  Bow lived with her black mother, Alicia, an attorney; her white father, Paul, a stay-at-home parent; and her two siblings. Alicia and Paul retained their hippie values from the commune.  Bow had no issues finding belonging within her family; the lack of belonging came almost exclusively from outside the family (e.g., at school).  Two extended family members regularly visited the family: Alicia's sister Denise, and Paul's father Harrison, who was also Alicia's boss.  Much of the familial conflict centered around the hippie parents' views conflicting with the more mainstream ideas of Denise and Harrison.  For example, Alicia and Paul told the children that race does not matter, but Denise argued that their commune-style, race-blind thinking would not work in the real world.  And when Harrison criticized Paul for being a stay-at-home parent in

the same episode in which Bow was struggling to navigate the black/white divide at school, Paul and Bow had a conversation about why it is hard for both of them to be "different."[18]

Norman contends both shows involve "an uplifting tone of self-affirmation." However, *Tragic* was not pitched as such. Rather, it was pitched as "honest and irreverent," "unflinching," and "off-kilter"; Hayley "isn't afraid to speak up" or "force the conversation"; and plots revolved around her "faux pas and her issues with society and other people's behavior." Hayley's upbringing was "misguided," and her efforts to connect with family and friends "usually creates more unrest and confusion." Plots and jokes included adult topics such as sex and drug use, as opposed to Bow and her siblings' experiences growing up in a supportive family and attending elementary/middle school. While there is some overlap in theme—mixed-race protagonists navigating a race-conscious world—the differences in theme far outweigh the similarities.

We next consider the series' plot devices. Norman argues that "[b]oth series take place in the present day," and that "[e]very episode of both series includes the 'way in' to the back story through the use of flashbacks." This is incorrect. Flashbacks were to be used in every episode of *Tragic*, but they were not used regularly in *Mixed-ish*, which was not set in the

---

[18]    In *Tragic*, Hayley's father was portrayed as a gambling addict and her mother's parents were "Russian alcoholics." Pointing to the line in *Mixed-ish*, episode 1 in which an amped-up Harrison says, "I do cocaine," Norman argues the family dynamics of the shows were similar because "both series also have a relative with addiction." Other than the single line in episode 1 of *Mixed-ish*, however, the series did not address addiction.

present day.  The pilot episode of *Mixed-ish* began in the present day and used a flashback to set up the story of Bow's life changing at age 12.  However, the remainder of *Mixed-ish* was set in the 1980's, with some retrospective narration by Bow's character as an adult. Thus, no rational jury would find the use of flashbacks support a finding of substantial similarity.

Norman also asserts that the settings of the shows were similar. *Tragic* was set in the city; Hayley lived with her fiancé in "East Hollywood (a.k.a. Little Armenia)."  In *Mixed-ish*, Bow and her family lived in a house owned by Paul's father in a nondescript suburb, and many of Bow's interactions occurred in her racially diverse school.  Norman contends that because young Hayley also grew up in the suburbs, this element is substantially similar.  This detail does not demonstrate that the settings of the shows are similar.  Moreover, the suburbs in the two series had opposite meanings: in *Tragic*, Hayley's white, suburban background was referenced as the reason she did not understand black culture, while the racially diverse suburb and school in *Mixed-ish* represented the harsh realities of the mainstream world compared to the commune.

Norman also contends that some of the jokes or plots of *Mixed-ish* came from the *Tragic* pitch.  She points to the joke in *Mixed-ish* about white people clapping on the 1 and the 3 beats, for example, but this joke is common fodder for comedians and musicians.[19]  Moreover, it made up mere seconds of a single *Mixed-ish* episode.  Norman also argues that *Mixed-ish* is similar to *Tragic* because both had "conservative" in-laws.  This is not a

---

[19]    Defendants point out that in *Black-ish*, season 2 episode 11, which aired in 2016, Bow and Dre's daughter Diane criticizes her twin brother Jack for clapping on the 1 and the 3.

major plot point in *Mixed-ish*, and in-laws having different political views than the main characters is a common family sitcom trope, which was also used in *Black-ish* with Dre's parents. These minor details do not support a finding of substantial similarity.

Norman also points to the plot about the children's hair for school picture day in episode 3 of *Mixed-ish*, comparing it to the meme about her childhood hair in the *Tragic* deck. In Norman's meme, however, her messy hair was shown as an indicator that her white mother did not know how to do black hair. In *Mixed-ish*, the conflict was whether the children should embrace their natural hair or conform to styles that were more mainstream at the time. Therefore, while both the *Tragic* meme and the *Mixed-ish* episode addressed children's hair, no reasonable jury would find them to be substantially similar.

Thus, the differences in general theme, tone, characters, relationships, settings, and plots demonstrate that the two series are not substantially similar. If "no rational jury could conclude the actionable elements" are similar, there is no inference of use as a matter of law. (*Ryder, supra*, 246 Cal.App.4th at p. 1073; see also *Spinner, supra*, 215 Cal.App.4th at p. 185.) Here, Norman has failed to meet her burden to show substantial similarity. The trial court's holding to the contrary was erroneous.

2.     *Breach of confidence*

The trial court found that Norman did not meet her second step anti-SLAPP burden for this cause of action because "she did not submit evidence that she requested her ideas be kept confidential when she disclosed them to Ross and Dobbins. She states she 'understood . . . that my sharing of my materials was done on a confidential basis (Norman Decl. ¶ 12), but she does not

67

state she told Ross and Dobbins that she was offering the materials to them in confidence." The court also noted that Norman did not claim that any special relationship between her and any defendant created a duty of confidentiality, and she cited no "legal authority holding that in Hollywood, custom and practice creates a duty of confidentiality whenever a person discloses an idea even if there is no communication of the confidentiality of the submission." Nevertheless, for reasons not explained in the court's order, the court denied the special motion to strike as to Ross and Artists First, and granted it as to Barris.

Defendants assert that the court's findings were correct, and its failure to strike the breach of confidence cause of action was error. Norman argues "that she explicitly requested confidentiality at the time of disclosure." She points to paragraph 4 of her declaration, but this paragraph discusses Norman's disclosure to Vogel at Big Breakfast—not to any defendants. Norman also points to paragraph 12 of her declaration, in which she states that when she met with Ross in January 2018, after Ross had already received the initial *Tragic* materials, Norman "understood like I did for my disclosures to BB, that my sharing of my materials was done on a confidential basis." Norman also relies on the declaration of her expert witness, Richard Marks, who stated that it is the custom and practice within the entertainment industry to keep pitch materials confidential.

This evidence does not demonstrate any understanding on the part of defendants of a confidential relationship, which is a necessary element of the claim. "An actionable breach of confidence will arise when an idea . . . is offered to another in confidence, and is voluntarily received by the offeree in

confidence with the understanding that it is not to be disclosed to others . . . There must exist evidence of the communication of the confidentiality of the submission or evidence from which a confidential relationship can be inferred." (*Faris, supra,* 97 Cal.App.3d at p. 323.)  Because such a claim is based on an implied obligation or contract between the parties, "the gravamen of the tort is an understanding between the parties that an idea is offered upon a condition of confidence." (*Tele-Count Engineers, Inc. v. Pacific Tel. & Tel. Co.* (1985) 168 Cal.App.3d 455, 464 (*Tele-Count Engineers*).)  It is therefore essential "that the plaintiff in a breach of confidence action must demonstrate the defendant's actual knowledge of the condition of confidentiality." (*Ibid.*, citing *Mann v. Columbia Pictures, Inc., supra*, 128 Cal.App.3d at p. 646; see also *Faris, supra*, 97 Cal.App.3d at p. 324 ["evidence of knowledge of confidence or from which a confidential relationship can be implied is a minimum prerequisite"].)

Norman's "understanding" that her communication was confidential, and her expert's opinion that pitches are typically considered confidential, do not meet this standard.  There is no suggestion in the evidence that defendants received the *Tragic* materials under an agreement of confidentiality.  To the contrary, Dobbins stated in his declaration that he was *not* told that the materials were confidential. Kelly-Clyne stated in his declaration that he did not tell Dobbins or Ross that the information was confidential: "As Big Breakfast had the exclusive rights to Tragic and owned the development, we did not communicate to Ms. Ross or her manager Brian Dobbins at [Artists First] that the Tragic project or ideas were Ms. Norman's proprietary and confidential information."

Moreover, as noted above, "a cause of action for 'breach of confidence' requires a finding that [the defendants] actually used [the plaintiff's] confidential information to their benefit." (*Hollywood Screentest, supra,* 151 Cal.App.4th at p. 651; see also *Esplanade Productions, supra,* 93 Cal.App.5th at p. 805.)  For the reasons discussed above, Norman cannot make that showing here.  Thus, Norman has not demonstrated a probability of success as to her breach of confidence cause of action as to any defendant, so the motion should have been granted for this claim.[20]

3.   *Promissory estoppel and intentional misrepresentation*

The elements of a promissory estoppel claim are: (1) a promise that is clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance was both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by the reliance.  (*Flintco Pacific, Inc. v. TEC Management Consultants, Inc.* (2016) 1 Cal.App.5th 727,

---

[20]    Norman contends the trial court erred in denying her motion seeking discovery regarding whether the relationship among the defendants may have constituted a joint venture due to the fact that Artists First and Big Breakfast shared a parent company, Electus.  She contends that with respect to the breach of implied-in-fact contract and breach of confidence causes of action, "should this court find that Norman has not met her Prong Two burden without establishing the existence of a [joint venture], then it is clear that the Superior Court abused its discretion" in denying Norman's request for discovery on this topic.  Because this is not the basis for our holding that Norman failed to demonstrate a probability of success, Norman has not demonstrated the court erred in denying her motion for discovery on this topic.

734.) "The essential elements of a count for intentional misrepresentation are (1) a misrepresentation, (2) knowledge of falsity, (3) intent to induce reliance, (4) actual and justifiable reliance, and (5) resulting damage." (*Chapman v. Skype Inc.* (2013) 220 Cal.App.4th 217, 230-231.)

The trial court held that Norman presented no evidence that she altered her actions in reliance on Ross's promises, or that Ross had no intent to perform when she made such promises. Norman argues the court erred, and points to paragraphs 13 and 14 of her declaration, which describe some of her early conversations with Ross. Norman asserts these paragraphs show that Norman "changed her position by deciding to move forward with Ross on [*Tragic*] and by disclosing all her materials to her."

However, the evidence showed that Norman wanted Ross to be involved in developing *Tragic*. Dobbins therefore sent the *Tragic* materials to Ross months before Ross and Norman talked. Norman said in her declaration that when she first spoke with Ross in January 2018, "my goal was to sell the series to Ross by . . . sharing ideas, concepts, and stories about [*Tragic*] directly with her" and "I told Ross that I would love to work with her." Norman and Ross did work together, and together they pitched *Tragic* to financiers. The evidence does not suggest that Norman changed her position in reliance on any promises made by Ross.

Moreover, Norman's damages for these causes of action arise from the allegation that defendants used material from *Tragic* to make *Mixed-ish* without compensating Norman. With respect to her promissory estoppel cause of action, for example, Norman argues in her appellate briefing, "It was Ross's full access to [*Tragic*] that enabled her to use it, or parts of it, as

'creator' and 'executive producer' of Mixed-ish."  And in her cause of action for intentional misrepresentation, she asserts that defendants "knew at the time of [their misrepresentations] that they intended to appropriate [*Tragic*] for themselves without having any intention of attaching Norman in any manner to the series 'Mixed-ish.'"  As discussed above, the evidence does not support a finding that *Mixed-ish* was substantially similar to *Tragic*, and there is no evidence supporting a finding that at the time Norman shared *Tragic* with defendants, they intended to steal her material.  Norman therefore has not met her burden to show a probability of success as to these causes of action.

4. *Intentional interference with contract and inducing breach of contract*

"To prevail on a cause of action for intentional interference with contractual relations, a plaintiff must plead and prove (1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage."  (*Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1148.)  The plaintiff also "must show the defendant's knowledge that the interference was certain or substantially certain to occur as a result of his or her action."  (*Ibid*.)  To prevail on a cause of action for inducing breach of contract, a plaintiff must prove (1) the existence of a valid contract with a third party; (2) the defendant had knowledge of the contract and intended to induce its breach; (3) the contract was in fact breached; (4) the breach was caused by defendant's unjustified or wrongful conduct; and (5) the

72

plaintiff suffered damages as a result. (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 291.)

The trial court found that Norman had not demonstrated a probability of success for these causes of action because she "did not submit evidence that Big Breakfast failed to perform or breached its contractual relationship as a result of the defendants' actions." The court noted that Big Breakfast worked with Norman, Ross, and others to develop *Tragic*, and pitched it to six potential financiers. The court stated that Norman "did not submit evidence that Big Breakfast would have successfully placed Plaintiff's series with a network or production company if the defendants had not started working on 'Mixed-ish' or that Big Breakfast abandoned her contract because of 'Mixed-ish' or any actions by the defendants."

The evidence supports this finding. Norman's agreement with Big Breakfast was to help develop *Tragic* and pitch it to financiers. The evidence shows that Big Breakfast did so. Norman does not directly address this on appeal. Rather, Norman contends that "within one month of *Mixed-ish* being publicly announced, BB terminated its relationship with Norman." The evidence shows, however, that Norman's agreement with Big Breakfast expired according to its own terms in March 2019—a date the parties agreed upon in October 2018, when they extended the term sheet originally signed in November 2017. Norman has not presented any evidence that defendants' actions affected the expiration of the agreement. Norman also contends Big Breakfast breached the agreement by "giv[ing] away the confidential elements of" *Tragic*. Assuming for the sake of argument this occurred and could be considered a

73

breach of contract, the evidence does not suggest the moving defendants induced that breach.

In addition, Norman asserts on appeal that the "contractual provision that Defendants are alleged to have interfered with and/or induced the breach of is Norman's right to receive compensation," and the "interference and breach are that [*Tragic*], in the disguise of *Mixed-ish*, was made without Norman being compensated." As discussed above, the two series are not substantially similar. Thus, Norman has not demonstrated a probability of prevailing on her causes of action for intentional interference with contract or inducing breach of contract.

We therefore find that Norman failed to meet her second-step burden of demonstrating a probability of success. Defendants' anti-SLAPP motions should have been granted in full. We therefore reverse the trial court's ruling as it pertains to Ross and Artists First, and remand the matter with instructions to the trial court to grant the motion as to them.

## D. Attorney fees

### 1. *Background*

Section 425.16, subdivision (c)(1) states in part, "[A] prevailing defendant on a special motion to strike shall be entitled to recover that defendant's attorney's fees and costs." Following the trial court's order on the anti-SLAPP motions, Barris, Dobbins, and ABC filed a single motion seeking separate attorney fee amounts: ABC requested $168,845.93, Barris requested $126,114.27, and Dobbins requested $52,330.34. They asserted that the trial court had granted their motions in full, and therefore they were entitled to recover their full attorney fees. Ross and Artists First filed a separate fee motion; Ross requested $52,594.87 and Artists First requested $36,311.47.

74

They noted that they had partially prevailed on their claims, because the trial court struck four of the six causes of action asserted against Ross, and three of the five causes of action asserted against Artists First.[21] In total, defendants requested $436,196.88 in attorney fees.

Norman opposed defendants' motions. She called defendants' requests "astronomically unreasonable" and suggested that the court strike them altogether. Norman also argued that the work was duplicative among all the defendants, and that fees were not recoverable for the portions of the motions that were not successful. Defendants filed replies in support of their motions.

In a written ruling dated May 27, 2022, the trial court granted defendants' motions for fees in part. The court noted that the parties agreed defendants were the prevailing parties, but disagreed as to the reasonableness of the fees requested and the allocation of those fees.

The court stated that the "legal issues were not particularly novel or difficult," because "well-established law governed most of the issues." The court also noted that Norman's "many causes of action and many claims asserted within the causes of action, as well as the multiple defendants, made these three anti-SLAPP motions more difficult than a typical anti-SLAPP motion. Also, [Norman's] requests to take discovery related to the anti-SLAPP motions added to the motion practice, expense, and timeline for deciding the motions."

---

[21] Defendants also filed memoranda of costs, which Norman moved to tax. The court partially granted the motion to tax. The costs are not at issue in this appeal.

75

The court noted that the "attorneys on both sides presented their arguments more skillfully than the average attorney."  It continued, "That being said, Defendants took a maximalist approach to this litigation."  The court noted that while a client may demand top-notch work, "that does not mean the adversary in the litigation is required to pay for such an all-out effort."  The court therefore found that not all of the time billed by defendants' counsel was "reasonable and necessary."

The court discussed defendants' motions and "deluge of evidence," and noted that "[t]he bulk of the evidence supported Defendants' arguments that [*Tragic*] and Mixed-ish were different, Mixed-ish was created independently and the allegedly stolen ideas pre-existed in Black-ish. . . . Defendants did not prevail on these fact-intensive arguments. In granting the motions, the court did not rely on much of the factual evidence presented."  Out of the approximately 934 hours of work billed by defense counsel, the court held that "500 hours was more than enough time in connection with the anti-SLAPP motions, including the discovery and fee motions."

Turning to the allocation of fees, the court found that the allocations defendants stated in their motions were not supported by the evidence.  The court stated, for example, "Even though the one cause of action against Dobbins was a small part of the complaint and the anti-SLAPP motion requiring little evidence, Defendants allocated to him one-third of the time spent on drafting the anti-SLAPP motion."  The court also noted that the amount allocated to Ross was relatively low, even though "Ross is at the center of this case" and she "moved to strike six causes of action" which were "fact-intensive."  The court noted that "most of the factual issues concerning the creation and development of

76

[*Tragic*] . . . and the alleged used of [*Tragic*] in Mixed-ish remain to be litigated and decided." The court concluded, "Having conducted a thorough analysis, the Court awards fees of $125,000 in total in favor of Defendants. Because defense counsel did not maintain separate billing records for each Defendant, defense counsel is in a better position to determine how to allocate that award among Defendants."

The court mailed the ruling to the parties on May 27, 2022. Norman served defendants a notice of the ruling on June 2, and defendants served Norman notice of the ruling on June 3.

Defendants submitted proposed judgments, and the court entered the following judgments on November 14, 2022: judgment in favor of Barris, including $35,714.29 in attorney fees; judgment in favor of Dobbins, including $8,928.57 in attorney fees; and judgment in favor of ABC, including $17,857.14 in attorney fees. The judgments therefore included $62,500.00—half of the total $125,000 the court allowed for attorney fees.

On December 7, 2022, Norman filed a notice of appeal, stating that she was appealing from the November 14 judgments.

2.    *Motion to dismiss*

Defendants moved to dismiss Norman's appeal, asserting that the trial court's May 27, 2022 order awarding attorneys' fees was directly appealable as a collateral order, and therefore Norman's December 7, 2022 notice of appeal was untimely. Defendants argue, "At the latest, Appellant had 60 days after service of Respondents' June 3, 2022 'Notice of Entry' of the May 27, 2022 Order to appeal. (Cal. Rules of Court, rule 8.104(a)(1)(B).)"

77

Norman opposes the motion to dismiss. She argues that the May 27 attorney fee order "was not and could not be final (and thus appealable) . . . because the Order itself provided Respondents were to allocate the amount of fees awarded by the Superior Court between themselves – (one of the primary bases for this Appeal) and, thus, the Order did not dispose of all issues raised by the Attorney Fee Motion"  She argued in the alternative that the appeal was timely as to Barris, Dobbins, and ABC, but not yet ripe as to Ross and Artists First, under the reasoning of *Doe v. Luster* (2006) 145 Cal.App.4th 139 (*Doe*), which held that an attorney fee ruling following an anti-SLAPP ruling is not an appealable order under section 425.16 and 904.1.

We deny defendants' motion to dismiss. "The right to appeal in California is generally governed by the 'one final judgment' rule, under which most interlocutory orders are not appealable." (*In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 754 (*In re Baycol Cases*), citing § 904.1.) Courts are "reluctant to depart from its principles and endorse broad exceptions that might entail multiple appeals absent compelling justification. . . . Accordingly, 'exceptions to the one final judgment rule should not be allowed unless clearly mandated.'" (*Id*. at p. 757.)

The ruling on an anti-SLAPP motion falls under an exception to the one final judgment rule pursuant to statute. Section 425.16, subdivision (i) states, "An order granting or denying a special motion to strike shall be appealable under Section 904.1." And section 904.1, subdivision (a)(13) allows an appeal "[f]rom an order granting or denying a special motion to strike under Sections 425.16."

Some cases have found that this statutory exception does not extend to rulings on attorney fee motions following an anti-

78

SLAPP motion. In *Doe, supra,* 145 Cal.App.4th at p. 150, for example, the court held, "If the motion for fees under section 425.16, subdivision (c), is filed after the trial court rules on the special motion to strike—as it was in the case at bar—the order awarding or denying those fees is not an 'order granting or denying a special motion to strike'; and no plausible argument can be made that such an order is immediately appealable under section 425.16, subdivision (i)." (See also *Baharian-Mehr v. Smith* (2010) 189 Cal.App.4th 265, 274 (*Baharian-Mehr*) ["we agree with the holding in *Doe* that a separate attorney fee order should not be heard on interlocutory appeal"].)

The court in *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 781 (*City of Colton*), another anti-SLAPP case, agreed that the "plain language of section 904.1 does not include an award of attorney's fees among the exceptions to the one final judgment rule." However, *City of Colton* held that "since the attorney fee order is (1) independent of the main causes of action, and (2) involves the payment of money by the appellant, we conclude it qualifies for the collateral order exception, and is directly appealable." (206 Cal.App.4th at p. 782.)

The collateral order exception "allows an appeal to be taken '[w]hen a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act.'" (*Longobardo v. Avco Corp.* (2023) 93 Cal.App.5th 429, 432, quoting *In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368.) "To qualify as appealable, the interlocutory order must be a final determination of a matter that is collateral—i.e., distinct and severable—from the general subject of the litigation. [Citations.] The order is deemed final if further

79

judicial action is not required on the matters dealt with by the order."  (*Koshak v. Malek* (2011) 200 Cal.App.4th 1540, 1545.)

Here, defendants argue that because the fee order can be deemed a collateral order, under the "one shot rule" Norman was obligated to appeal directly from that order rather than waiting for a judgment.  As explained by the Supreme Court, "California follows a 'one shot' rule under which, if an order is appealable, appeal must be taken or the right to appellate review is forfeited. (See § 906 [the powers of a reviewing court do not include the power to 'review any decision or order from which an appeal might have been taken' but was not] . . . .)  If [an] order was appealable, it follows that it had to be timely appealed or the right to challenge its particulars be forever lost."  (*In re Baycol Cases, supra,* 51 Cal.4th at p. 762 fn. 8.)  Defendants argue that because Norman did not timely appeal from the order, and instead waited until judgments were entered, Norman missed her "one shot."

We decline to find that the collateral order doctrine and the one shot rule together bar Norman's appeal.  First, some case authority, including *Doe* quoted above, specifically states that a fee order such as this one is *not* appealable under section 425.16. As a matter of fairness, we decline to dismiss Norman's appeal as untimely while case law on the issue is in conflict. In the absence of clear authority to the contrary, Norman and her counsel were entitled to rely on *Doe*'s reasoning that an appeal directly from the attorney fee order was not permitted under section 425.16.

Second, defendants cite no cases in which the collateral order doctrine and the one shot rule have been combined to render untimely an appeal filed after entry of judgment.  Rather, the court in *City of Colton*—which defendants assert is "directly

80

on point"—used the collateral order rule to find that the court *did* have jurisdiction to decide the fee award ruling. (See *City of Colton, supra*, 206 Cal.App.4th at p. 782.) Similarly, the court in *Baharian-Mehr*, although not relying on the collateral order doctrine, stated that when "the issue of whether the anti-SLAPP motion should have been granted is properly before the appellate court, it would be absurd to defer the issue of attorney fees until a future date, resulting in the probable waste of judicial resources. When the first issue is properly raised, appellate jurisdiction over both issues under section 425.16, subdivision (i) is proper." (*Baharian-Mehr, supra*, 189 Cal.App.4th at p. 275.) Another case cited by defendants, *Apex LLC v. Korusfood.com* (2013) 222 Cal.App.4th 1010, 1016, also held that jurisdiction was proper under the collateral order doctrine. These cases do not employ the collateral order doctrine to bar appellants from appealing following a final judgment.

These cases do not support a finding that the collateral order doctrine, combined with the one shot rule, supports a motion to dismiss an appeal filed after entry of judgment under the circumstances here. We therefore deny defendants' motion to dismiss Norman's appeal of the judgments entered against Barris, Dobbins, and ABC.[22]

3. *Analysis*

Turning to the substance of Norman's challenge to the fee award, she asserts that defendants' fee requests were so

---

[22] To the extent Norman's notice of appeal was intended to challenge the fee award as it pertains to Ross and Artists First, it was either untimely (based on the date of the court's fee award order) or not yet ripe (because the fee awards had not been reduced to judgments).

excessive that they should have been reduced to zero, and that this court should further reduce the award based on an allocation formula Norman proposes. We find no error, and affirm.

An award of attorney fees under section 425.16 is reviewed for abuse of discretion. (*Frym v. 601 Main Street LLC* (2022) 82 Cal.App.5th 613, 619; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1130.) When reviewing an attorney fee award, the appellate court indulges all inferences in favor of the trial court's order and presumes the trial court's attorney fee award is correct. (*569 East County Boulevard LLC v. Backcountry Against the Dump, Inc.* (2016) 6 Cal.App.5th 426, 433-434 (*569 East County*).) "'Fees approved by the trial court are presumed to be reasonable . . . .'" (*Laffitte v. Robert Half Internat. Inc.* (2016) 1 Cal.5th 480, 488.)

First, Norman contends the trial court "should not have awarded any fees because defendants' request is grossly exorbitant." She argues that defendants were not entitled to any fees due to the "breathtaking amount of their requested fees" as well as their "blatant attempt to shift the fees from the main Partially-Prevailing Defendants (Ross and AF) to the peripheral Prevailing Defendants (Barris, Dobbins, and ABC)."

Norman relies on *Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315 (*Christian Research Institute*), and argues that defendants "should face the consequences outlined in *Christian Research Institute*: rejection of the entire request." The case does not support her argument. There, the appellate court affirmed the trial court's award of attorney fees that represented "25 hours for the motion, 40 hours for the appeal, and 6 hours of attorney time for the fee motion." (*Id.* at p. 1320.) Moreover, nothing in *Christian Research Institute* suggests that a trial court abuses its discretion by awarding fees under section 425.16 if

defendants' fee request is excessive.  In cases such as *Christian Research Institute* and *569 East County, supra,* 6 Cal.App.5th 426, which Norman also cites, when courts find a fee request to be excessive, they award less than the requested amount of attorney fees—which is exactly what the trial court did here. Norman has not demonstrated that the trial court abused its discretion in doing so.

Second, Norman asserts that the trial court abused its discretion by allowing defendants to apportion the fee award among themselves.  She argues that the way defendants apportioned the fees—with half represented in the judgments in favor of Barris, Dobbins, and ABC—was unfair.  Norman asserts that defendants were entitled to attorney fees of "no more than $50,000" among  them.[23]  She urges this court to reduce the award and reapportion the fees using her own complicated formula and six-step analysis, which involve determining which party prevailed on which "issues," and eliminating fees for any duplicative work on those issues.

Norman's arguments have become moot.  She relies on *Mann v. Quality Old Time Service, Inc.* (2006) 139 Cal.App.4th 328, 344-345 (*Mann*), which states, "[A] defendant should not be entitled to obtain as a matter of right his or her entire attorney fees incurred on successful and unsuccessful claims merely because the attorney work on those claims was overlapping.

---

[23]    Defendants correctly point out that Norman provides no basis for this amount in her opening brief.  In her reply brief, Norman argues it constitutes a reduction in fees similar to the percentages of reduction in *Christian Research Institute, supra,* 165 Cal.App.4th 1315 and *569 East County, supra,* 6 Cal.App.5th 426.

83

Instead, the court should first determine the lodestar amount for the hours expended on the successful claims, and, if the work on the successful and unsuccessful causes of action was overlapping, the court should then consider the defendant's relative success on the motion in achieving his or her objective, and reduce the amount if appropriate." Following this appeal, however, defendants are fully successful—there are neither unsuccessful defendants nor unsuccessful causes of action, and therefore no basis for apportioning fees based on the defendants' relative success. The reasoning of *Mann* does not apply.

Moreover, Norman's argument is not supported by any other statute or case law. She cites no authority suggesting that on a special motion to strike, when counsel works simultaneously for multiple clients on overlapping legal issues, the trial court is required to apportion fees in any particular manner. In other contexts, apportionment is not necessarily required. (See, e.g., *Brown Bark III, L.P. v. Haver* (2013) 219 Cal.App.4th 809, 830 ["allocation among jointly represented parties 'is not required when the liability of the parties is "so factually interrelated that it would have been impossible to separate the activities . . . into compensable and noncompensable time units"'"]; *Calvo Fisher & Jacob LLP v. Lujan* (2015) 234 Cal.App.4th 608, 625 [attorney fees need not be allocated where the "claims were so intertwined as to make it impracticable, if not impossible, to separate the attorneys' time"].) Thus, Norman has not met her burden to demonstrate that the trial court abused its discretion in its fee award to Barris, Dobbins, and ABC.[24]

---

[24] Defendants have not challenged the fee ruling, and therefore we address the court's ruling only as it pertains to the arguments Norman asserts on appeal.

Finally, we note that Norman's opening brief in this appeal was correctly characterized by defendants as "bombastic," and filled with "*ad homimem* attacks." Norman, represented by her counsel, Plonsker Law LLP, engaged in a heated tirade against defendants' billing practices, referring to defendants' requests, evidence, and arguments as "exorbitant," "incredible," "audacious," misguided," "confusing," "incomprehensible," "unbelievabl[e]," "haphazard," "flagrant," "false and evidence-free," "shenanigans," "based on whole-cloth inventions," an "abuse[ of] trust," and lacking in "logic, reason, or support." The brief opines that defendants' counsel submitted evidence in the manner they did because they were "[o]bviously embarrassed to reveal how much they actually charged their clients," trying to "pretend there is some deep logic" for the way fees were apportioned, and intended to improperly "shift the padded fees" to certain defendants. The brief suggests the trial court was "unimpressed" and "all but accused [defendants] of dishonesty." These quotes constitute a mere sampling; there are many more instances of similar derogatory phrasing scattered throughout Norman's 60-page opening brief.

We find the unnecessary commentary in Norman's brief lacking in professionalism. We expect civility and decorum from counsel who appear in this court, and this brief falls short of that expectation. We trust counsel will meet these standards in the future.

## DISPOSITION

The judgments in favor of Barris, Dobbins, and ABC are affirmed. The trial court's order denying the special motion to strike under section 425.16 as to Ross and Artists First is reversed. The matter is remanded to the trial court with

85

instructions to grant the special motions to strike in full as to Ross and Artists First.  Defendants are entitled to their costs on appeal.

**CERTIFIED FOR PARTIAL PUBLICATION**


COLLINS, J.

We concur:


CURREY, P. J.


MORI, J.